IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 29710-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOEL CAMERON CONDON, | ) | |
| | ) | UNPUBLISHED OPINION |
| Appellant. | ) | |

SIDDOWAY, A.C.J. — Joel Condon, the shooter in a home invasion robbery that resulted in the death of Carmelo Ramirez, appeals his conviction for aggravated first degree murder and burglary. He raises eight challenges, but we find reversible error in only one instance: the trial court's failure to instruct the jury on second degree intentional murder as a lesser degree offense to the State's charge of first degree premeditated murder. We affirm Mr. Condon's convictions of first degree burglary, unlawful possession of a firearm, and a firearm enhancement. We reverse his conviction of aggravated first degree murder on the basis of the instructional error and remand for a new trial on the murder charges.

FACTS AND PROCEDURAL BACKGROUND

At around 8 p.m. on an evening in January 2009, two men burst through the front door of the home in Toppenish where Carmelo Ramirez and Enedina Gregorio lived with their three children. Evidence later revealed that the two men—Joel Condon and Jesus Padilla Lozano—had impulsively decided to rob the home of a drug dealer from whom a mutual acquaintance had purchased cocaine earlier in the evening. Their acquaintance described the dealer as having flashed a great deal of cash. Apparently Mr. Condon and Mr. Lozano traveled to the wrong residence, because instead of encountering a drug dealer, they encountered Mr. Ramirez and Ms. Gregorio preparing to eat dinner, their 13-year-old son Jesus watching television with his cousin, and two younger children playing in a bedroom.

Three witnesses testified at trial to their personal knowledge of the invasion. Their testimony was somewhat conflicting. Among the uncontested evidence was that the two men burst into the home; that the taller of the two (Mr. Condon was several inches taller) brandished a handgun immediately upon entering; that the two men yelled demands in English, which the Spanish-speaking family members either did not understand or only partially understood; that early on in the encounter, Ms. Gregorio followed her 13-year-old son Jesus into a bedroom where the two younger children had been playing and helped the three children escape out a back window; and that Ms. Gregorio then either returned or was pulled back into the main room of the home.

2

Ms. Gregorio's version of events was that after helping the children escape she returned to the main room, where she saw her husband trying to take the handgun from Mr. Condon. She testified that Mr. Lozano grabbed her, she struggled, but he succeeded in throwing her face-down on a sofa where he held her hands behind her back. She stated that she then heard a shot ring out shortly after Martin Gutirrez, a friend of the family who had been invited to dinner, arrived at the front of the home. The prosecutor suggested in closing argument that the men had seen the headlights of Mr. Gutirrez's car. Ms. Gregorio inferred that the shooting began because, with the arrival of Mr. Gutirrez, the men were scared. The intruders then ran from the home through the back door and she and her husband ran out the front, enlisting Mr. Gutirrez to drive Mr. Ramirez to the hospital.

Ms. Gregorio did not realize that her husband had been seriously injured, although it turned out he had been shot twice, with one bullet entering his thigh and the other passing through his elbow into his chest, where it clipped his aorta. Mr. Ramirez lost consciousness before Mr. Gutirrez could reach the hospital; nurses at the Farm Workers Clinic, where Mr. Gutirrez stopped to get more immediate help, were unable to save him.

Mr. Lozano's version was that on the day of the crime he and Mr. Condon had been riding around with Mr. Condon's friend "Eight Ball" and Eight Ball's girl friend. Mr. Lozano had known Mr. Condon (whom he knew as "Wak-Wak") for only a month. Since meeting, they had smoked pot together virtually every day, often hanging out with

3

Eight Ball. In the early evening, Eight Ball left the car to purchase cocaine and, on his return, told the others about the cash he observed in the home of the dealer. Upon hearing that, Mr. Condon and Mr. Lozano decided to commit the robbery. Mr. Lozano testified that the plan was only to steal money and drugs. He claimed to be unaware until they entered the home that Mr. Condon had a gun.

According to Mr. Lozano, he and Mr. Condon were dropped off by Eight Ball's girl friend about a quarter mile from the Ramirez/Gregorio home and walked to what they believed was the drug dealer's home, where Mr. Condon kicked in the door and entered first. Following their entry, Mr. Ramirez defended against the invasion by fighting with Mr. Lozano, not with Mr. Condon, and eventually managed to get Mr. Lozano into a chokehold. It was after "I was like turning purple," according to Mr. Lozano, that Mr. Condon fired two shots at Mr. Ramirez. Report of Proceedings (RP) at 797. Mr. Lozano agreed that he and Mr. Condon then ran out through the back of the home, although he claims he returned once, for just a moment, to see if he could find any cash, because "we were there for money so I might as well—you know, not went for nothing." RP at 798.

Jesus Ramirez, who was 15 by the time of trial, testified that he was sitting in the living room with his cousin when the men burst in; his parents were in the kitchen and stood up immediately upon the intrusion. Jesus left for his bedroom where his younger brother and sister joined him. He was directing them to hide under his bed when his

4

mother came in, followed by the smaller intruder, whose entry she blocked. She opened the window and told the children to leave, which they did.

Mr. Lozano dropped his cell phone during the crime and police quickly traced it to him through the telephone number of his mother, who placed calls to the phone the evening of the crime and whose number was stored within the phone. Within days, there were news reports that Mr. Lozano was a suspect, in response to which he initially fled to Mexico.

He did not stay long, turning himself in approximately six weeks later. In a recorded statement that he provided to Detective Brian Jackson approximately seven weeks after the crime, he described the man he knew as Wak-Wak as a tall, light skinned "native," who had a tattoo on his neck of a scroll with writing. Ex. 106, at 15. Other detectives in the department later identified Mr. Condon from the description.

Shortly after the State filed charges against Mr. Condon and before his arraignment, the State requested an order requiring him to participate in a lineup. Mr. Condon asked the court to order that the lineup be double-blind and sequential. A double-blind sequential lineup is one in which neither the officer conducting the lineup nor the witness knows which person is the suspect and which are the decoys. The participants in the lineup are presented to the witness in sequence, rather than simultaneously. The court ordered the lineup but denied Mr. Condon's request that it be sequential and double-blind.

Detective Jackson, the lead investigator on the case, conducted a six-person lineup in which Mr. Condon and the five others, each wearing jail-issued clothing and Ace bandages around their necks (to hide Mr. Condon's tattoo), stood side-by-side. Mr. Condon was taller than the others; Detective Jackson would later explain that he used individuals who were in custody and tried to include only individuals who were at least six feet tall, but was unsuccessful. Mr. Condon was the only Native American. Detective Jackson testified that this was because the other Native Americans available to participate all had long hair that would distinguish them from Mr. Condon, whose hair was short. In addition to Mr. Condon, then, the participants comprised four Hispanics and one Caucasian. Mr. Condon's lawyer objected to the lineup procedure and to the use of a Caucasian police officer as one of the decoys.

Ms. Gregorio was the first witness asked to view the lineup and quickly identified Mr. Condon. She made her identification within 10 seconds, stating that "she couldn't be one hundred percent but she was pretty sure" and "she recognized him from his face." RP at 89. Jesus Ramirez and his cousin were unable to identify anyone from the lineup after a minute of observation.

Mr. Condon moved to suppress Ms. Gregorio's identification of him, arguing the lineup was impermissibly suggestive. At the hearing on his motion to suppress, he called Dr. Geoffrey Loftus, an experimental psychologist whose area of research is human perception and human memory. Dr. Loftus testified to what he believed to be

6

shortcomings in the conduct of the lineup and aspects of Ms. Gregorio's identification that, in his opinion, cast doubt on the reliability of the identification. The court denied the motion to suppress.

Shortly before trial, Mr. Lozano made a deal with the State. He testified against Mr. Condon at trial.

At trial, Ms. Gregorio made an in-court identification of Mr. Condon and testified about her pretrial identification. At trial she claimed to be "one hundred percent sure that it was him." RP at 749.

In the court's conferences with the lawyers during the course of trial, Mr. Condon asked that the jury be instructed on second degree intentional murder as a lesser offense to first degree premeditated murder. After hearing extensive argument on the issue, the trial court refused to give the instruction.

The jury convicted Mr. Condon of aggravated first degree murder, first degree burglary, unlawful possession of a firearm in the second degree, and firearm enhancements. The trial court imposed the mandatory minimum penalty for aggravated first degree murder: life without the possibility of parole. RCW 10.95.030. It imposed a sentence of 176 months for the conviction of first degree burglary (a term including a 60-month firearm enhancement) and 60 months for the conviction of second degree unlawful possession of a firearm. It directed that the portion of the latter two sentences not attributable to the firearm enhancements run concurrently. Mr. Condon appeals.

ANALYSIS

Mr. Condon makes the following assignments of error: (1) there was insufficient evidence to prove premeditation; the trial court erred in (2) refusing to instruct the jury on second degree intentional murder, (3) denying his motion to suppress Ms. Gregorio's identification given a lineup that he argues was unduly suggestive, and (4) excluding expert testimony addressing eyewitness perception and memory; and (5) the prosecutor committed misconduct, (6) he was denied effective assistance of counsel, (7) the accomplice liability statute is unconstitutionally overbroad, and (8) the trial court miscalculated his offender score. We address the assignments of error in turn.

I

Mr. Condon first argues that the State's evidence of premeditated intent—all circumstantial—was insufficient. He points to the testimony of his partner in the crime, Mr. Lozano, who said the intent was only to rob; the absence of any evidence of statements by Mr. Condon admitting or implying a different intent; the trajectory of the two shots, which would not ordinarily have been fatal; and the fact that, while he entered the home with a drawn pistol, he did not shoot anyone until (depending on which eyewitness account was believed) Mr. Ramirez tried to take the gun from Mr. Condon or was strangling Mr. Lozano in a chokehold.

Due process requires the State to prove all elements of the crime beyond a reasonable doubt. *State v. Washington*, 135 Wn. App. 42, 48, 143 P.3d 606 (2006).

Evidence is sufficient to support a conviction if, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt. *State v. Kintz*, 169 Wn.2d 537, 551, 238 P.3d 470 (2010). "'A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom.'" *Id.* (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)). We defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004) (citing *State v. Cord*, 103 Wn.2d 361, 367, 693 P.2d 81 (1985)), *abrogated in part on other grounds by Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

To be convicted for first degree premeditated murder, the prosecution must prove beyond a reasonable doubt that with a premeditated intent Mr. Condon caused the death of Mr. Ramirez. RCW 9A.32.030(1)(a); Clerk's Papers at 216-19. It is the element of premeditation that distinguishes first from second degree murder. *State v. Bingham*, 105 Wn.2d 820, 823, 719 P.2d 109 (1986). The premeditation "must involve more than a moment in point of time." RCW 9A.32.020.

Premeditation may be proved by circumstantial evidence where the supporting inferences are reasonable and the evidence is substantial. *State v. Gregory*, 158 Wn.2d 759, 817, 147 P.3d 1201 (2006); *State v. Gentry*, 125 Wn.2d 570, 598, 888 P.2d 1105 (1995). The defendant's motive, procurement of a weapon, stealth, and method of killing

9

are "particularly relevant" factors to establish premeditation. *State v. Pirtle*, 127 Wn.2d 628, 644, 904 P.2d 245 (1995); *State v. Sherrill*, 145 Wn. App. 473, 484-85, 186 P.3d 1157 (2008). Specifically, "'[t]he planned presence of a weapon necessary to facilitate a killing has been held to be adequate evidence to allow the issue of premeditation to go to the jury.'" *State v. Massey*, 60 Wn. App. 131, 145, 803 P.2d 340 (1990) (alteration in original) (quoting *Bingham*, 105 Wn.2d at 827).

Viewing the evidence in the light most favorable to the State, the evidence that Mr. Condon brought a loaded handgun to the Ramirez/Gregorio residence, intended to commit a robbery, and wielded the handgun when he kicked in the door is sufficient evidence to support the element of premeditation.

## II

Faced with the first degree premeditated murder charge, Mr. Condon asked that the court instruct the jury on the lesser degree offense of murder in the second degree, intentional murder. The trial court refused. Mr. Condon's next assignment of error is to the trial court's refusal to give the requested instruction.

A defendant has a statutory right to have lesser degree offenses presented to a jury. RCW 10.61.003, .010. The State concedes that legally, second degree murder is a lesser degree offense. A second requirement must be met to present the lesser degree offense, however: a factual showing (more particularized than that required for other instructions) that "the evidence must raise an inference that *only* the lesser included/inferior degree

10

offense was committed to the exclusion of the charged offense." *State v. Fernandez-Medina*, 141 Wn.2d 448, 455, 6 P.3d 1150 (2000). It was this requirement that the court found lacking.[1]

The standard of review we apply to jury instructions depends on the decision under review. The instructions must be sufficient to allow the parties to argue their theory of the case. *Havens v. C&D Plastics, Inc.*, 124 Wn.2d 158, 165, 876 P.2d 435 (1994). Whether or not that standard has been met is a question of law that we review de novo. *Cox v. Spangler*, 141 Wn.2d 431, 442, 5 P.3d 1265, 22 P.3d 791 (2000). Whether the court's instructions to the jury are accurate statements of the law is also a question of law that we review de novo. *State v. Becklin*, 163 Wn.2d 519, 525, 182 P.3d 944 (2008). Once these threshold requirements have been met, we then review the judge's wording, choice, or the number of instructions for abuse of discretion. *State v. Hathaway*, 161 Wn. App. 634, 647, 251 P.3d 253 (selection of more general, rather than specific, instruction; abuse of discretion standard applied), *review denied*, 172 Wn.2d 1021 (2011); *Anfinson v. FedEx Ground Package Sys., Inc.*, 159 Wn. App. 35, 244 P.3d 32 (2010) (abuse of

---

[1] While the trial court offered an alternative rationale that Mr. Condon must satisfy the *State v. Workman*, 90 Wn.2d 443, 584 P.2d 382 (1978) test for both first degree premeditated murder and felony murder in order to be entitled to instruction on second degree murder, the State does not rely on that basis for the trial court's decision on appeal. It was erroneous. *See State v. Schaffer*, 135 Wn.2d 355, 957 P.2d 214 (1998) (defendant was entitled to instruction on manslaughter as a lesser degree charge to first degree premeditated murder even though it would not have been a lesser degree charge of second degree felony murder, which was also charged).

discretion standard applies to number of instructions and specific wording), *aff'd*, 174 Wn.2d 851, 281 P.3d 289 (2012).

The failure of the trial court properly to instruct the jury is presumed to be prejudicial to the defendant unless the error affirmatively appears harmless. *State v. Southerland*, 109 Wn.2d 389, 390-91, 745 P.2d 33 (1987). Since the right to a lesser included offense instruction derives from a statute, nonconstitutional harmless error analysis applies. *Id.* at 391.

The State defends the trial court's conclusion that the evidence did not raise the inference that only intentional murder was committed to the exclusion of premeditated murder. "[T]he *intentional* but unpremeditated killing of a human being, unless it is justified or excusable, is murder in the second degree. The state can raise a homicide to first degree murder by proving that the intentional unjustified killing of a human being was *premeditated.*" *State v. Thomas*, 58 Wn.2d 746, 751, 364 P.2d 930 (1961) (Mallery, J., dissenting), *overruled on other grounds by State v. Rogers*, 83 Wn.2d 553, 520 P.2d 159 (1974). When inquiring whether the evidence raises the inference that only the lesser degree offense was committed, the court must consider all of the evidence presented at trial and view it in the light most favorable to the party requesting the instruction. *Fernandez-Medina*, 141 Wn.2d at 455-56.

The period of premeditation required for first degree murder may be short. But the very existence of a lesser degree "intentional" crime and the legislature's definition of

12

premeditation as requiring "more than a moment in point of time," RCW 9A.32.020 and .030, makes clear that more is required to prove premeditation than simply that the defendant first formed the intent to commit murder and then acted upon it. Our Supreme Court has defined premeditation as "'*deliberate formation of* and *reflection upon* the intent to take a human life [that] involves the mental process of *thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time*, however short.'" *Gregory*, 158 Wn.2d at 817 (emphasis added) (alteration in original) (quoting *State v. Hoffman*, 116 Wn.2d 51, 82-83, 804 P.2d 577 (1991)).

In section I, we viewed the evidence in a light most favorable to the State for sufficiency of evidence purposes and readily determined that the evidence presented by the State was enough to support premeditation. But the evidence in this case—some conflicting—could support a number of conclusions. Here, viewing the evidence in a light most favorable to Mr. Condon, we just as readily determine that it could support a verdict of second degree murder to the exclusion of premeditated murder. A jury could conclude from the testimony of the eyewitnesses that Mr. Condon shot Mr. Ramirez in reaction to Mr. Ramirez trying to wrest the handgun from him, or that he shot Mr. Ramirez because Mr. Lozano was turning purple from Mr. Ramirez's chokehold. This affirmative evidence suggesting that Mr. Condon acted intentionally, but impulsively, would not support the element of premeditation required for first degree premeditated murder. It "'would permit a jury to rationally find [the] defendant guilty of the lesser

13

offense and acquit him of the greater.'" *Fernandez-Medina*, 141 Wn.2d at 456 (quoting *State v. Warden*, 133 Wn.2d 559, 563, 947 P.2d 708 (1997)).

The State argues that Mr. Condon did not defend on the basis that he was concerned about being disarmed or about Mr. Ramirez's chokehold on Mr. Lozano, however; it argues "[t]he defense theory was simply that the State had not proven its case against him." Br. of Resp't at 15. But this is the precise point addressed and rejected in *Fernandez-Medina*. There, the defendant claimed an alibi, yet requested an instruction that if he committed assault, it was only second degree assault. The Supreme Court embraced the reasoning of *State v. McClam*, 69 Wn. App. 885, 850 P.2d 1377 (1993) that defendants can present inconsistent defenses. In *McClam*, as here, the defendant relied on affirmative evidence presented by the State, not him, that tended to support a lesser offense. The trial court is to view "*all* of the evidence that is presented at trial" in the light most favorable to the defendant's request for the instruction. *Fernandez-Medina*, 141 Wn.2d at 456 (emphasis added).

It was error, then, for the trial court to refuse Mr. Condon's request for the instruction. But the error does not require reversal if it was harmless. The error was not prejudicial unless, within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected. *Southerland*, 109 Wn.2d at 391.

14

Washington courts have found the failure to instruct on a lesser degree offense to be harmless in only those cases where other verdicts returned by the same jury demonstrate the jury's implicit rejection of the lesser degree offense. For instance, where a jury rejects an intermediate degree offense, it is valid to infer that it would have rejected other, even lesser degree offenses. *See State v. Guilliot*, 106 Wn. App. 355, 22 P.3d 1266 (2001); *State v. Hansen*, 46 Wn. App. 292, 730 P.2d 706, 737 P.2d 670 (1986). Otherwise, Washington decisions appear to subscribe to the view that

> "as the law gives the defendant the unqualified right to have the inferior degree passed upon by the jury, it is not within the province of the court to say that the defendant was not prejudiced by the refusal of the court to submit that phase of the case to the jury, or to speculate upon probable results in the absence of such instructions."

*State v. Parker*, 102 Wn.2d 161, 163-64, 683 P.2d 189 (1984) (quoting *State v. Young*, 22 Wash. 273, 276, 60 P. 650 (1900)).

The State argues that the jury's returning a verdict of guilty of premeditated murder rather than felony murder makes this case like *Guilliot* and *Hansen*. We disagree. The instructions given with respect to those two crimes did not draw the jury's attention to the difference between premeditation and intent, as instruction on second degree murder would have. Consider the State's closing argument:

> Now, what does premeditation mean? Is this some multi-week plan or days or even hours? No, not necessarily. Premeditated means thought over beforehand. When a person, after any deliberation; I'm talking about Instruction No. 10, forms intent to take a human life, the killing may follow

15

immediately after the formation of the settled purpose and it will still be premeditated.

RP at 1134. We cannot say that the jury implicitly rejected the possibility that Mr. Condon's shooting was intentional but impulsive rather than premeditated. Its attention was not effectively drawn to the distinction.

If given the option, the jury might have found Mr. Condon's actions to be intentional but impulsive rather than premeditated. We cannot conclude that the error was harmless.

One can, however, fairly infer from the jury's conviction of Mr. Condon for first degree murder, first degree burglary and possession of a firearm, that it would have convicted him of the alternative crime of first degree felony murder charged in count one. But the jury was instructed that it need not return a verdict on the felony murder charge if it found Mr. Condon guilty of first degree premeditated murder. As a result, it did not complete a verdict form for felony murder. Conviction of first degree felony murder at the trial below, or in a future trial, would not subject Mr. Condon to the mandatory minimum sentence of life in prison without the possibility of parole presented by the aggravated first degree murder charge.

We must, therefore, reverse the conviction of first degree aggravated murder and remand for a retrial of the murder charges.

16

Because the instructional error does not affect Mr. Condon's convictions of first degree burglary and unlawful possession of a firearm, we turn to his remaining assignments of error.

## III

Mr. Condon next argues that evidence of Ms. Gregorio's pretrial identification of him should have been suppressed and her in-court identification excluded because her initial identification was tainted by an impermissibly suggestive lineup. He places principal reliance on the fact that the lineup took place after Ms. Gregorio had attended two court hearings at which she saw him and that she may also have seen him on television news. Br. of Appellant at 25-26. He argues several reliability issues as additional reasons for suppressing the evidence.

Mr. Condon filed his opening brief and assigned error before the United States Supreme Court's decision in *Perry v. New Hampshire*, __ U.S. __, 132 S. Ct. 716, 181 L. Ed. 2d 694 (2012). The parties completed their briefing before this court decided *State v. Sanchez*, 171 Wn. App. 518, 288 P.3d 351 (2012), *petition for review filed*, No. 88603-2 (Wash. Mar. 27, 2013), and the Washington Supreme Court decided *State v. Allen*, ___ Wn.2d ___, 294 P.3d 679 (2013). Mr. Condon's arguments cannot succeed in light of the three decisions' holdings addressing the limited situations in which the due process clause requires excluding eyewitness identification evidence.

The decisions establish that the United States Constitution "'protects a defendant against a conviction based on evidence of questionable reliability[, not by prohibiting introduction of the evidence, but] by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit.'" *Allen*, 294 P.3d at 685 (quoting *Perry*, 132 S. Ct. at 723). Constitutional safeguards available to defendants to counter the State's evidence include the Sixth Amendment rights to counsel, compulsory process, and confrontation plus cross-examination of witnesses. Apart from these guarantees, state and federal statutes and rules ordinarily govern the admissibility of evidence, and juries are assigned the task of determining the reliability of the evidence presented at trial. *Perry*, 132 S. Ct. at 723.

For the exclusion of eyewitness identification to be required by the due process clause, the unnecessarily suggestive circumstances of the identification must have been arranged by law enforcement. *Sanchez*, 171 Wn. App. at 573. The due process clause does not require a judicial inquiry into identifications whose reliability is in doubt for other reasons. *Perry*, 132 S. Ct. at 730. Moreover, "due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary." *Id.* at 724 (citing *Manson v. Brathwaite*, 432 U.S. 98, 107, 109, 112-13, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977)).

With this limitation and standard in mind, we review a trial court's decision on whether to admit an out-of-court identification for abuse of discretion. *State v. Kinard*,

18

109 Wn. App. 428, 432, 36 P.3d 573 (2001); *State v. Birch*, 151 Wn. App. 504, 514, 213 P.3d 63 (2009). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds. *State v. Neal*, 144 Wn.2d 600, 609, 30 P.3d 1255 (2001).

Consideration of a challenge to an out-of-court lineup identification involves two steps. *State v. Ramires*, 109 Wn. App. 749, 761, 37 P.3d 343 (2002). First, the defendant must show the lineup procedure was impermissibly suggestive. *Id.* If it is, then the court considers the reliability factors set forth in *Neil v. Biggers*, 409 U.S. 188, 199-200, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), which can overcome the corrupting effect of the suggestive identification procedure. *Sanchez*, 171 Wn. App. at 573. If the defendant does not meet the initial burden of demonstrating that the lineup was impermissibly suggestive, the inquiry ends. *Ramires*, 109 Wn. App. at 761.

Mr. Condon claims that Ms. Gregorio's identification at the lineup was impermissibly suggestive because it took place after she attended two of his court hearings and possibly saw him on television. These circumstances were not arranged by law enforcement. Whether her familiarity with Mr. Condon from having seen him in court cast doubt on her identification was therefore a matter for cross-examination, not suppression.

As to the circumstances of the lineup itself, Mr. Condon has not identified aspects of the lineup that were both suggestive and unnecessary. Detective Jackson's explanation

19

of his difficulty in enlisting participants sharing more similarities with Mr. Condon stands unchallenged. In denying the suppression motion, the trial court commented on the testimony of the defense expert, Dr. Loftus, who acknowledged that the State had taken some affirmative steps helpful to the reliability of the lineup, such as providing the participants with similar clothing and covering their necks in order to obscure Mr. Condon's distinctive tattoo. Having reviewed pictures of the participants in the lineup, the trial court observed they were "remarkably similar in many regards." RP at 382. Because Mr. Condon has not demonstrated that the State created an unduly suggestive lineup procedure, we need not consider the *Biggers* factors.

## IV

Mr. Condon next argues that the trial court abused its discretion by excluding the testimony of Dr. Loftus. The trial court's decision to exclude the evidence was informed in part by Dr. Loftus's live testimony at the suppression hearing, during which Dr. Loftus summarized and previewed the opinions to which he expected to testify at trial.

At the suppression hearing, Dr. Loftus testified concerning what studies have revealed about how memories of a complex event form and persist. His principal point, as it related to eyewitness identification in legal proceedings, was that given the manner in which memories are formed and refined, a witness may have a memory that seems real and in which the witness has great confidence but that has become less accurate over time. This is especially true if postevent information is provided.

20

Dr. Loftus also testified to what he perceived to be three shortcomings of the lineup conducted by Detective Jackson, based on his understanding of the procedure and photographs he had received of the six participants, both individually, and as they appeared at the lineup. His criticisms of the lineup were that (1) it was not double-blind, (2) it was not sequential, and (3) Mr. Condon was the tallest participant in the lineup. Mr. Condon's height was a concern because Dr. Loftus understood that in originally describing the shooter, Ms. Gregorio emphasized that he was tall but was unable to recall details of his face. Because she had focused on his height, she would be inclined to identify a participant who was tall.

The trial court also relied upon the testimony of Detective Jackson presented at the suppression hearing. Detective Jackson testified that at the time of the lineup Ms. Gregorio initially stepped into the back of the viewing room; that he encouraged her to get closer to the mirror so that she could see all six participants; and that within about 10 seconds of stepping closer, she pointed to Mr. Condon and told the interpreter who was present that he was the man who was in the house that night. After she made the identification, Mr. Condon's lawyer and his investigator questioned her about how certain she was, in response to which she stated that she could not be 100 percent sure but that she was pretty sure and that she recognized him from his face.

The detective acknowledged that Ms. Gregorio had always described the shooter as quite tall and that, at 6 feet 2 inches, Mr. Condon was the tallest participant in the

lineup. In defense of the lineup, however, he testified that while he had not achieved his goal of including only participants who were 6 feet tall or taller, he had been able to include some participants who were 6 feet tall. He also testified that Ms. Gregorio is only 4 feet 11 inches and that many people are tall compared to her.

A defendant in a criminal case has a constitutional right to present the testimony of witnesses in order to establish a defense. *State v. Cheatam*, 150 Wn.2d 626, 648, 81 P.3d 830 (2003). Our Supreme Court held in *Cheatam* that when eyewitness identification is a key element of the State's case, the trial court must carefully consider whether expert testimony on the reliability of eyewitness identification evidence would assist the jury in assessing the reliability of eyewitness testimony. *Id.* at 649; *see also State v. Allen*, 161 Wn. App. 727, 741, 255 P.3d 784, *aff'd*, 294 P.3d 679 (2011). The admission of expert testimony on the reliability of eyewitness identification is still within the discretion of the trial court, though, and will only be reversed if the court abuses that discretion. *State v. Coe*, 109 Wn.2d 832, 844, 750 P.2d 208 (1988). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds. *Neal*, 144 Wn.2d at 609.

The eyewitness testimony below was not key in the sense that it was in *Cheatam*, in which the evidence against the defendant was only the rape victim's identification and a forensic expert's testimony to an inconclusive visual match between the defendant's shoe and a photograph of a footprint at the scene of the crime. Here, the State presented

Mr. Lozano's testimony that Mr. Condon was his partner in the crime and the shooter. It also presented evidence of Mr. Condon's admissions to a jailhouse informant and recorded conversations between Mr. Condon and his girl friend in which he made statements that could be understood as inculpatory. Cross-racial identification was not identified by Dr. Loftus as a concern and the trial court commented that he did not realize Mr. Condon was Native American until he was told. RP at 382.

The trial court concluded that Mr. Condon would be able to explore the weaknesses in Ms. Gregorio's identification through cross-examination and that expert testimony discrediting this single aspect of the evidence would not be helpful and could be confusing to the jury. Mr. Condon thereafter did engage in extensive cross-examination of Ms. Gregorio and Detective Jackson concerning her identification and challenged her identification in closing argument. If the relevance or helpfulness of expert testimony is debatable, a trial court's decision to exclude it will be upheld. *Cheatam*, 150 Wn.2d at 652. While another trial court might have admitted Dr. Loftus's testimony, we cannot say that the trial court abused its discretion in excluding it.

V

Mr. Condon next complains of prosecutorial misconduct, citing the prosecutor's representation that the State had an unusual amount of evidence against Mr. Condon and the theme of the prosecutor's rebuttal argument maligning defense counsel.

A defendant claiming to have been denied a fair trial as a result of prosecutorial misconduct bears the burden of establishing that the prosecutor's misconduct was both improper and prejudicial. *State v. Finch*, 137 Wn.2d 792, 839, 975 P.2d 967 (1999). A defendant's failure to object to a prosecutor's improper remark constitutes a waiver, unless the remark was so flagrant and ill-intentioned that it evinces an enduring and resulting prejudice that could not have been cured by an instruction to the jury. *Gregory*, 158 Wn.2d at 841.

Mr. Condon did not object to the prosecutor's comment suggesting a surplus of evidence against him. The statement was in reply to Mr. Condon's closing argument, which had emphasized, among other matters, the dearth of forensic evidence and the fact that Jesus Ramirez and his cousin had not identified Mr. Condon. Early in his rebuttal, the prosecutor said, "The State doesn't have much? If only the State had this much evidence in all of our cases." RP at 1153. After recapping its evidence, the prosecutor repeated, "[I]f only the State had so much evidence in all of our cases." *Id.* at 1154.

It is misconduct for a prosecutor to suggest that evidence not presented at trial provides additional grounds for finding a defendant guilty, *State v. Russell*, 125 Wn.2d 24, 87, 882 P.2d 747 (1994). A similar problem is presented here, with a prosecutor suggesting that the State's case is stronger than most, because the jury is invited to trust the prosecutor's knowledge rather than evidence that the jury can assess for itself. An opinion of the sort expressed here is less problematic than implying to the jury that

additional evidence exists against the defendant who is on trial, which the jury has not seen, however. A jury is unlikely to view the sort of opinion expressed by the prosecutor in this case as relevant to its task.

The prosecutor's statements are also less of a concern given the context in which they were made. The prosecutor was responding to the defense argument inventorying all of the evidence the State did not pursue or had not found. And defense counsel conveyed one comparison of his own, arguing,

> We have a shoe print, we have photographs of it; but nobody does anything with it. We don't take the door off and haul it down to the sheriff's department, *which I have seen done in the past*. We don't take better photographs; they're two there, they're not terrible photographs. But the simple point is we don't do anything with what we have.

RP at 1142 (emphasis added).

The prosecutor, as an advocate, is entitled to make a fair response to the arguments of defense counsel. *Russell*, 125 Wn.2d at 87. A prosecutor's remarks must be examined within the context of the trial to determine the probable effect they would have on the jury's ability to judge the evidence fairly and, "[i]n this context, defense counsel's conduct, as well as the nature of the prosecutor's response, is relevant." *United States v. Young*, 470 U.S. 1, 12, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985).

Given the fleeting nature of the prosecutor's statements, considering them in light of the preceding argument by the defense, and mindful of the court's instructions, we are confident that they did not interfere with the jury's ability to judge the evidence fairly.

Mr. Condon's second allegation of misconduct presents a more serious problem. The prosecutor's rebuttal argument was, indeed, organized as a primer for jurors on truth-distorting tactics of defense lawyers—what he characterized as "Defense 101." RP at 1154. He suggested that here, as in other cases, defense lawyers "distract from the evidence," "[c]reate resentment toward the police," "[c]onfuse the witnesses," "[c]onfuse the law," and "impugn the police" by either treating them as "jack booted thug liars" or "really nice and they just didn't get the job done . . . keystone cops." RP at 1154-57. The prosecutor drew Mr. Condon's objection when he argued, while describing defense counsel's cross-examination of Ms. Gregorio, "And confusing the witnesses—did you see the trick that [defense counsel]—it was actually quite skillful." *Id.* at 1156.

"It is improper for the prosecutor to disparagingly comment on defense counsel's role or impugn the defense lawyer's integrity." *State v. Thorgerson*, 172 Wn.2d 438, 451, 258 P.3d 43 (2011). In *Thorgerson*, the Supreme Court unanimously condemned a prosecutor's arguments that "'[t]he entire defense is sl[e]ight of hand. Look over here, but don't pay attention there. . . . Look at everything except what matters.'" *Id.* (second alteration in original). It held that the argument "went beyond the bounds of acceptable behavior," and, inasmuch as the argument was planned in advance, was ill-intentioned misconduct.[2] *Id.* at 452. In *State v. Warren*, 165 Wn.2d 17, 29, 195 P.3d 940 (2008), the

---

[2] The members of the court were divided on whether the misconduct required reversal. The dissent, which believed reversal was required, observed that "'[s]leight of

court held that it was misconduct for a prosecutor to describe defense counsel's argument as "'an example of what people go through in a criminal justice system when they deal with defense attorneys'" and as a "'classic example of taking these facts and completely twisting them to their own benefit, and hoping that you are not smart enough to figure out what in fact they are doing.'" In *State v. Gonzales*, 111 Wn. App. 276, 283-84, 45 P.3d 205 (2002), the court strongly criticized a prosecutor's argument that unlike defense attorneys, prosecutors take an oath to "'see that justice is served.'"

In light of these and other precedents, it is hard to imagine that the prosecutor did not recognize that his "Defense 101" theme was improper. The points that he then made about the evidence were a fair response to the arguments of defense counsel. But it was unquestionably misconduct to introduce each of his points with a theme disparaging defense lawyers as, e.g., "distracting from the evidence," "confusing the facts," or "confusing the law."

Where a defendant timely objects to prosecutorial misconduct, reversal is required if the appellate court determines there is a substantial likelihood the misconduct affected the jury's verdict. *Gregory*, 158 Wn.2d at 841. Where the defendant not only objects but moves for a mistrial, "we give deference to the trial court's ruling because it is in the best position to evaluate whether the prosecutor's comment prejudiced the defendant." *Id.*

---

hand' implies trickery or wrongdoing and can be interpreted as an attack on counsel rather than on counsel's arguments." 172 Wn.2d at 466 (Chambers, J., dissenting).

"The trial court should grant a mistrial only when the defendant has been so prejudiced that nothing short of a new trial can ensure that the defendant will be fairly tried." *State v. Emery*, 174 Wn.2d 741, 765, 278 P.3d 653 (2012). When reviewing a trial court's denial of a mistrial for abuse of discretion, abuse will be found only when no reasonable judge would have reached the same conclusion. *Id.*

This was a seven-day trial. Mr. Condon's lawyer's conduct during the trial was professional and effective and his closing argument was well-organized and measured. It is unlikely that the prosecutor's ill-considered comments would outweigh the impression the jury had already formed of defense counsel. The trial court had also instructed the jurors before closing arguments that "[t]he lawyers' remarks, statements and arguments are intended to help you understand the evidence and apply the law. . . . You must disregard any remark, statement or argument that is not supported by the evidence or the law in my instructions." RP at 1102-03.

The trial court was in the best position to assess any prejudice. While it should have sustained the objection to the prosecutor's disparaging remarks, we do not doubt its judgment that Mr. Condon was not prejudiced.

VI

Mr. Condon next argues that he received ineffective assistance of counsel because his lawyer failed to object to the admission of Mr. Lozano's unredacted recorded interview from March 2009 as substantive evidence and failed to seek an instruction

28

limiting the jury's use of the evidence to its proper purpose. The 55-minute recorded interview included allegations that Mr. Condon belonged to a gang and frequently used illegal drugs.

The Sixth Amendment and article I, section 22 of the Washington State Constitution guarantee the right to counsel. To prevail on his ineffective assistance claim, Mr. Condon must show both that "counsel's representation fell below an objective standard of reasonableness," *Strickland v. Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. A claim for ineffective assistance presents a mixed question of law and fact, which appellate courts review de novo. *State v. Cross*, 156 Wn.2d 580, 605, 132 P.3d 80 (2006).

The video recording was offered and admitted after Mr. Condon's lawyer established in cross-examining Mr. Lozano that he had not originally named Mr. Condon as his partner in the crime and suggested that Mr. Lozano fabricated Mr. Condon's involvement as the shooter in order to obtain lenient treatment. The challenge to Mr. Lozano's testimony was exemplified by the following cross-examination:

> Q. ... For the past twenty-four months you have been held in custody correct? Or, I'm sorry, twenty-two months?
> A. Yes.

> Q. And throughout the pendency of that time you have consistently denied that Mr. Condon was in any way involved in this incident haven't you?
> A. Yes.
> Q. Now, approximately eight days ago when you were four days away from commencing trial you elected to contact the authorities and give a statement correct?
> A. Yes.

RP at 818-19. After questioning Mr. Lozano about the plea agreement he had reached

with the State, defense counsel continued:

> Q. So you have a substantial reason to testify today and tell us all of these stories?
> A. Not stories. It's what happened.
> Q. Okay. It's quite easy to point the finger at someone else isn't it?
> A. Yeah.
> . . . .
> Q. Now you were only able to provide a vague description of this person to Detective Jackson correct? In your statement on March 10th?
> A. Yeah.
> Q. Tall, skinny, maybe Native American?
> A. Yeah.
> Q. And that—tall, skinny and tattoos—okay. Tall, skinny and tattoos. That is a description that would fit most of the players on a local basketball team, isn't it?
> A. I wouldn't know.
> Q. Now you knew you were going to testify today correct?
> A. Yes.
> Q. And you have practiced your testimony correct?
> A. No.
> Q. No? And you have not reviewed it in any way?
> A. Testimony?
> Q. Yeah. Rehearsed it?
> A. No.

Q.     Now twice during the interview Detective Jackson asked you for the gentleman's name that you were with and neither time you could give it to him correct?
A.     Yes.
Q.     But later after all the media exposure, three months later you were able to provide a name? Isn't that true?
A.     Yes.

RP at 820-22.

After this cross-examination, the next witness called by the State was Detective Jackson, for the purpose of identifying and offering the State's video recording of his March 10 interview of Mr. Lozano. The State's position was that contrary to the implication of the cross-examination, Mr. Lozano's original statement was "remarkably consistent" with his trial testimony. RP at 834. Anticipating that Mr. Condon would object to the video recording as hearsay, the State argued that the recording was not hearsay because Mr. Lozano had testified at trial, was subject to cross-examination concerning the statement, and the statement was "consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." ER 801(d)(1)(ii).

On appeal, Mr. Condon argues that his lawyer was confused about the statement's hearsay status and therefore objected ineffectively; that he failed to argue, as he should have, that Mr. Lozano had always had an incentive to lie; that he should have argued for exclusion of much of the recording, which was unduly prejudicial; and that he should have asked for a limiting instruction. We disagree. Review of the record reveals that Mr.

31

Condon's trial lawyer understood the probable admissibility of the recording and had tactical reasons for allowing the entire recording to be played.

First, Mr. Condon is wrong in arguing that a limiting instruction would have been appropriate. A prior consistent statement admissible under ER 801(d)(1)(ii) is admissible as substantive evidence if not objectionable on other grounds. *State v. Walker*, 38 Wn. App. 841, 844, 690 P.2d 1182 (1984); *Tome v. United States*, 513 U.S. 150, 157, 115 S. Ct. 696, 130 L. Ed. 2d 574 (1995) (observing that equivalent statements are nonhearsay and admissible as substantive evidence under Fed. R. Evid. 801(d)(1)(B)).

Second, the arguments on appeal misperceive the trial lawyer's position on the hearsay status of the evidence. When the lawyer stated that the prosecutor "is saying that I am going to say that the—video and audio of the interview is hearsay and I—and I am *supposedly* objecting to it on that basis," RP at 829 (emphasis added), we do not understand him to have been confused about his own objection. Rather, the prosecutor had assumed in offering the evidence that Mr. Condon would object to the recording as hearsay and, based on that assumption, he preemptively offered ER 801(d)(1)(ii) as an exemption authorizing admission of the evidence. The prosecutor assumed wrong. When we review the arguments in the trial court as a whole, it appears that Mr. Condon's lawyer always recognized that the recording was not hearsay if offered to rebut a claim of recent fabrication, hence his comment that he was "supposedly" objecting to the evidence as hearsay.

32

Third, the argument that Mr. Lozano had a motive to lie at the time of his initial interview by Detective Jackson on March 10 ignores the fact that he had a different motive to lie shortly before trial, when he contacted the State and offered to testify against Mr. Condon. There was substantial evidence that at the time of his initial interview, Mr. Lozano did not realize that he could be charged with anything as serious as murder for his unarmed participation in an unsuccessful robbery. Toward the end of the interview, the detective explained felony murder. This argument on appeal as to why the ER 801(d)(1)(ii) exemption did not apply is not persuasive and it was not ineffective assistance for the trial lawyer not to raise the argument below.

We view the trial lawyer's decision not to request redaction of the recording as tactical. It is fair to say that casting doubt on Mr. Lozano's credibility was the lawyer's most important task in defending Mr. Condon. The jury could believe that Ms. Gregorio was truthful and yet still question the reliability of her identification. If the jury believed that Mr. Lozano was truthful, though, anything Mr. Lozano might have said about drug use or gang affiliation would be the least of Mr. Condon's problems—the State's murder charge would be effectively proved. As the trial court said to Mr. Condon's lawyer when admission of the recording was being argued, "I think you've raised the issue [of fabrication] and I—frankly—I don't know how you—you would have avoided it. I mean, you *had* to raise the issue." RP at 834 (emphasis added).

33

Had defense counsel moved to exclude any of the recording, he would have been least successful in excluding statements about Wak-Wak. It was those statements that were, after all, the rationale for admitting the recording. And so long as Mr. Lozano's statements about Wak-Wak were going to come in, a reasonable trial lawyer could conclude that it might as well be in the context of the entire recording rather than in a pared-down form that would emphasize Mr. Lozano's consistent statements. Especially given the importance of discrediting Mr. Lozano and this particular recording, which trial counsel described as follows:

> [T]he performance of Mr. Padilla Lozano on his interview with Detective Jackson is at times utterly incoherent, bizarre, pointless, rambling and I think the detective was even having trouble getting him to stay on point. I mean it's . . .
>     . . . .
>     . . . every other word is F - and you know, you get a headache listening to it because it's so incoherent.

RP at 836.

Mr. Condon has not demonstrated any performance or omission by his trial lawyer that fell below an objective standard of reasonableness. We therefore need not address whether, but for the asserted unprofessional errors, the result of the proceeding would have been different.

34

VII

Mr. Condon next argues that the accomplice liability statute, RCW 9A.08.020, is unconstitutionally overbroad because it criminalizes speech and conduct protected by the First Amendment.

Under RCW 9A.08.020(3)(a)(ii), one may be convicted as an accomplice if he, acting "[w]ith knowledge that it will promote or facilitate the commission of the crime, he or she . . . [a]ids or agrees to aid such other person in planning or committing it."[3] The statute does not define "aid" but Washington decisions have long accepted the pattern jury instruction's definition of "aid." It first appeared in Washington cases in the instruction cited in *State v. McKeown*, 23 Wn. App. 582, 591, 596 P.2d 1100 (1979):

> "The word 'aid' means all assistance whether given by words, acts, encouragement, support or presence. A person who is present at the scene and is ready to assist by his or her presence is aiding in the commission of the crime."

The definition appears to be unique to the Washington statute.

"The First Amendment, applicable to the States through the Fourteenth Amendment, provides that 'Congress shall make no law . . . abridging the freedom of speech.'" *Virginia v. Black*, 538 U.S. 343, 358, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003) (alteration in original). A state criminal law "may be invalidated as overbroad if

---

[3] We quote the current version of RCW 9A.08.020, which was amended by Laws of 2011, chapter 336, section 351 to make the language gender neutral.

35

'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 130 S. Ct. 1577, 1587, 176 L. Ed. 2d 435 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6, 128 S. Ct. 1184, 170 L. Ed. 2d 151 (2008)).

Mr. Condon relies on *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S. Ct. 1827, 23 L. Ed. 2d 430 (1969), in which the United States Supreme Court held that "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." He argues that the accomplice liability statute runs afoul of the First Amendment by criminalizing "aid" or "agreement to aid," defining it to include pure speech, and then failing to limit the speech that it criminalizes to speech directed to inciting or producing imminent lawless action.

Divisions One and Two of our court have rejected this same First Amendment challenge to the accomplice liability statute. In *State v. Coleman*, 155 Wn. App. 951, 960-61, 231 P.3d 212 (2010), Division One relied on the mens rea requirement imposed by the statute, likening it to the pedestrian interference ordinance that our Supreme Court concluded was not overbroad in *City of Seattle v. Webster*, 115 Wn.2d 635, 802 P.2d 1333 (1990). In *State v. Ferguson*, 164 Wn. App. 370, 376, 264 P.3d 575 (2011), Division Two adopted the *Coleman* analysis, adding that the statute's language forbids

36

only advocacy directed at and likely to incite or produce imminent lawless action, thereby conforming to *Brandenburg*'s limitations.

Mr. Condon argues that we should reject *Coleman* and *Ferguson* as wrongly decided because they erroneously rely on cases involving conduct, whereas the act of "aiding" can involve pure speech. He also argues that the decisions rely for constitutionality on the mens rea required for criminal liability, which, he argues, is insufficient in and of itself to avoid First Amendment problems.

Justice Utter observed in *Webster* that specific intent does not always save ordinances from overbreadth challenges. 115 Wn.2d at 648 (Utter, J., concurring in part and dissenting in part). In *McCoy v. Stewart*, 282 F.3d 626 (9th Cir.), *cert. denied*, 537 U.S. 993, 123 S. Ct. 468, 154 L. Ed. 2d 361 (2002), the Ninth Circuit granted habeas relief to a prisoner serving time under an Arizona statute that made it a crime to participate in a criminal syndicate, rejecting the reasoning of the Arizona appellate courts that the statute survived First Amendment attack because it required proof of intent to promote or further the criminal objectives of a criminal syndicate. Summarizing *Brandenburg*, *Hess v. Indiana*, 414 U.S. 105, 94 S. Ct. 326, 38 L. Ed. 2d 303 (1973), and other decisions, the Ninth Circuit observed that "timing is crucial, because speech must incite imminent lawless action to be constitutionally proscribable," "a state cannot constitutionally sanction 'advocacy of illegal action at some indefinite future time,'" and

37

> [o]ther decisions confirm that speech that advocates, teaches, or justifies lawlessness in an abstract way is fully protected, so long as it is not directed to inciting imminent lawless action. The protection afforded an individual's abstract advocacy of lawlessness endures even if the individual hopes that someday such lawlessness may occur.

282 F.3d at 631 & n.5 (quoting *Hess*, 414 U.S. at 108).

Mr. Condon's examples of lawful action falling within the sweep of the accomplice liability statute's prohibitions are "[the] college professor who praises ongoing acts of criminal trespass by Occupy Wall Street protestors," "[the] journalist sent to cover the protest," and "[the] attorney who agrees to represent the protestors *pro bono*." Br. of Appellant at 48.

The accomplice liability statute has been construed to apply only when the accomplice acts with knowledge of the specific crime that is eventually charged, rather than with knowledge of a different crime or generalized knowledge of criminal activity. *State v. Cronin*, 142 Wn.2d 568, 578-79, 14 P.3d 752 (2000); *State v. Roberts*, 142 Wn.2d 471, 512, 14 P.3d 713 (2000). And the required aid or agreement to aid the other person must be "in *planning or committing* [the crime]." Statutes are presumed to be constitutional and wherever possible "'it is the duty of [the] court to construe a statute so as to uphold its constitutionality.'" *In re Det. of Danforth*, 173 Wn.2d 59, 70, 264 P.3d 783 (2011) (quoting *State v. Reyes*, 104 Wn.2d 35, 41, 700 P.2d 1155 (1985)). We construe the accessory liability statute to require that the accessory have some affirmative and direct connection to the planning and commission of a particular crime. Thus read, it

38

does not reach the "mere advocacy" of a college professor, the visibility provided by a journalist, or comfort or support to the criminal that is unrelated to planning or committing the crime. *Brandenburg*, on which Mr. Condon so heavily relies, "expressly encompassed nothing more than 'mere advocacy.'" *McCoy*, 123 S. Ct. at 469 (Stevens, J., statement respecting denial of petition for writ of certiorari).

We therefore agree with Divisions One and Two that that accomplice liability statute is constitutional.

## VIII

Mr. Condon's final assignment of error was to his offender score. He acknowledges in his reply brief that he overlooked an acknowledgment of his offender score by his trial lawyer during sentencing proceedings. He makes no further argument. There was no error.

We affirm Mr. Condon's convictions of first degree burglary, unlawful possession of a firearm, and a firearm enhancement. We reverse his conviction of aggravated first degree murder on the basis of the instructional error and remand for a new trial on the murder charges.

No. 29710-1-III
*State v. Condon*

A majority of the panel has determined that this opinion will not be printed in the Washington Appellate Reports but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, A.C.J.

WE CONCUR:

_____
Sweeney, J.

_____
Kulik, J.