[No. 25686-0-II. Division Two. May 18, 2001.]

THE STATE OF WASHINGTON, *Respondent*, v. EDMUND JOHN GUILLIOT, *Appellant*.

356

*Linda J. King*, for appellant (appointed counsel for appeal).

*Gerald A. Horne, Prosecuting Attorney*, and *Barbara L. Corey-Boulet, Deputy*, for respondent.

SEINFELD, J. — Edmund Guilliot sought to present a diminished capacity defense against a first degree premeditated murder charge for killing his fiancée. He claimed that he had a personality disorder that interfered with his ability to self-medicate his diabetes, which in turn led to hypoglycemia, which in turn caused mental impairment. After ruling that Guilliot had not laid an adequate foundation, the trial court excluded evidence of Guilliot's personality disorder and his expert's opinion on Guilliot's ability to form the intent to kill and to premeditate. Guilliot challenges these rulings along with the court's refusal to give lesser included offense instructions. He also alleges evidentiary error, prosecutorial misconduct, and ineffective assistance of counsel. Finding no abuse of trial court discretion or other reversible error, we affirm.

## FACTS

Guilliot pointed a 9 mm semiautomatic handgun at his fiancée, Sharon Sullivan, pressed the trigger, and shot her in the head. Fifteen or twenty seconds later, he shot her again. Sullivan died from her injuries.

At the time, Guilliot was at Sullivan's apartment in Tacoma where they had been arguing about their relationship, including Guilliot's lack of candor about his employment and his illnesses, cystic fibrosis and diabetes. After the shooting, Guilliot took the gun and drove to his parents' home, told his mother there had been an accident, and prepared himself a beverage shake.

Guilliot's mother called his father at work and all three

returned to Sullivan's apartment about twenty minutes later when, at his father's direction, Guilliot called 911. He told the operator that he had accidentally shot Sullivan when he was showing her the gun. He also said that he had diabetes and that he thought he had low blood sugar.

After his arrest, Guilliot told police that he had taken insulin and had something to eat at approximately 7 A.M. the day of the shooting, eventually went back to sleep with Sullivan, and awoke at about 9 A.M. when he drank some juice and ate a rice cake, thinking this resolved any diabetic reaction he might have been experiencing. The shooting occurred around 11:30 A.M. that same morning. Guilliot also told police that he and Sullivan had argued and that he was angry when he shot her.

The State charged Guilliot with first degree premeditated murder in violation of RCW 9A.32.030(1)(a), with a firearm enhancement. Guilliot sought to present a diminished capacity defense based on hypoglycemia. At a pretrial hearing, the trial court heard testimony from Guilliot's expert witness, Dr. Killoran; Guilliot's treating physician, Dr. Carter;[1] a psychologist, Dr. Whitehill; and Guilliot's mother. Based on this testimony, the trial court allowed Guilliot's expert to testify about hypoglycemia and to give an opinion that Guilliot was hypoglycemic at the time of the shooting, but it excluded evidence of Guilliot's narcissistic personality disorder and his expert's opinion that Guilliot lacked the ability to form the intent to kill at the time of the shooting.

The trial court instructed the jury on first and second degree murder but declined to instruct on manslaughter. The jury found Guilliot guilty of first degree murder.

## I. DIMINISHED CAPACITY

Guilliot challenges the rulings excluding testimony about

---

[1] As a military dependent, Guilliot received treatment at Madigan Army Medical Center. Under army regulations, Dr. Carter could not testify as an expert witness but could testify only as to the factual information regarding his own patient.

his alleged narcissistic personality disorder and excluding his expert's opinion that he lacked the ability to form the intent to kill and to premeditate that intent.

■■■ The admissibility of evidence rests within the trial court's sound discretion and we will not disturb its ruling unless no reasonable person would adopt the trial court's view. *State v. Atsbeha*, 142 Wn.2d 904, 913-14, 16 P.3d 626 (2001); *State v. Ellis*, 136 Wn.2d 498, 504, 963 P.2d 843 (1998). Criminal defendants also have the constitutional right to present, with some limitations, relevant evidence in their defense. *State v. Smith*, 101 Wn.2d 36, 41, 677 P.2d 100 (1984); *State v. Rehak*, 67 Wn. App. 157, 162, 834 P.2d 651 (1992).

A. *EDMON* FACTORS

Guilliot first asserts that the trial court committed reversible error by using the *State v. Edmon*, 28 Wn. App. 98, 621 P.2d 1310 (1981), factors to evaluate the admissibility of expert testimony on his diminished capacity defense.

■ In *Ellis*, the Supreme Court rejected reliance on the *Edmon* factors as "the last, absolute and definitive word on foundational requirements for presentation or admissibility of expert testimony on diminished capacity." 136 Wn.2d at 522. The *Ellis* court concluded that the trial court should look to ER 401, 402, and 702[2] to determine the admissibility of such evidence. 136 Wn.2d at 523. Since *Ellis*, other appellate decisions have emphasized that the trial court should consider the admissibility of diminished capacity

---

[2] ER 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

ER 401 provides: " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

And ER 402 provides: "All relevant evidence is admissible, except as limited by constitutional requirements or as otherwise provided by statute, by these rules, or by other rules or regulations applicable in the courts of this state. Evidence which is not relevant is not admissible."

expert testimony under the aforementioned rules of evidence. *See, e.g., Atsbeha*, 142 Wn.2d at 915-16; *State v. Greene*, 139 Wn.2d 64, 73 n.3, 984 P.2d 1024 (1999), *cert. denied*, 529 U.S. 1090 (2000); *State v. Bottrell*, 103 Wn. App. 706, 713-14, 14 P.3d 164 (2000); *State v. Mitchell*, 102 Wn. App. 21, 25-26, 997 P.2d 373 (2000).

█ Here, although the trial court mistakenly considered the *Edmon* factors, it also independently considered the admissibility of Guilliot's diminished capacity evidence under ER 702, 401, and 402. Thus, its initial use of an incorrect test was harmless. *See Mitchell*, 102 Wn. App. at 26.

### B. EXCLUSION OF EXPERT TESTIMONY

Guilliot supported his motion to present a diminished capacity defense with a statement that he would present testimony showing that he did not check his blood sugar before self-medicating himself the morning of the shooting and that he consequently injected too much insulin, thereby causing hypoglycemia. Guilliot specified that his treating physician, Dr. Carter, would testify about his diabetes, about his daily one-shot regimen of insulin, and about his instances of low blood sugar while being treated at Madigan Army Medical Center. The motion indicated that Killoran, a psychiatrist, would testify about hypoglycemia's effect on higher brain function and would opine that Guilliot suffers a hypoglycemic episode when he injects too much insulin.

Killoran provided an offer of proof at a pretrial hearing about the narcissistic personality traits he had observed in Guilliot and the tendency those traits had to make an individual deny any physical defects. Killoran testified that although there was a "logical bridge" between these narcissistic personality features and Guilliot's tendency to have insulin reactions, the only psychiatric condition relevant to his diminished capacity opinion was the alleged insulin reaction or hypoglycemia. The trial court sustained the State's objection to the mental disorder evidence, thereby

precluding testimony on Guilliot's narcissistic personality features.

Killoran also testified that, to a reasonable degree of medical certainty, Guilliot "suffered from a hypoglycemic episode at the time [of the shooting] resulting in mental confusion and impaired ability to premeditate and a decreased ability to form the requisite [sic] to commit the charge." 7 Report of Proceedings (RP) at 339. Killoran based this opinion on information Guilliot provided about the amount of food he ingested and the amount of insulin he injected the morning of the shooting, on a review of the discovery documents, and on a one and one-half hour interview with Guilliot.

But Killoran admitted on cross-examination that he did not review Guilliot's medical records or speak with Guilliot's treating physician. Killoran could not quantitatively determine Guilliot's blood sugar level at the time of the shooting but estimated it was between 50 and 60 milligrams per dilution. And Killoran conceded that Guilliot's report of injecting his normal daily dosage of insulin the morning of the shooting belied the narcissistic personality features that suggested a tendency to ignore his diabetes.

Carter, Guilliot's treating physician, also testified about his treatment of Guilliot's diabetes and his recommendation that Guilliot maintain his blood sugar levels between 70 and 150. Carter indicated that even when Guilliot's blood sugar levels were in the 40s or 50s, Guilliot did not appear incoherent, unconscious, or otherwise unable to answer questions appropriately.

The trial court ruled that there was not substantial evidence of a mental condition that prevented Guilliot from forming the culpable mental states and that none of the expert witnesses could testify to such a condition to a reasonable degree of medical certainty. But the trial court found that the testimony on diabetes would be helpful to the jury and, thus, allowed Killoran to opine that Guilliot may have been hypoglycemic at the time of the shooting.

The court found Carter qualified to testify about diabetes but ruled that Killoran, a psychiatrist, was not.[3] The court noted that Killoran had not reviewed Guilliot's medical records, had not independently tested him, and generally was unaware of the range in which Guilliot was asymptomatic. Guilliot challenges the exclusion of evidence about his personality disorder and his expert's opinion that he lacked the ability to form the culpable mental states.

■ To support a diminished capacity defense, Guilliot had to produce substantial evidence and expert testimony "demonstrating that a mental disorder, not amounting to insanity, impaired the defendant's ability to form the culpable mental state to commit the crime charged." *Atsbeha*, 142 Wn.2d at 914; *State v. Ferrick*, 81 Wn.2d 942, 944-45, 506 P.2d 860 (1973). Further, that evidence must "logically and reasonably connect the defendant's alleged mental condition with the asserted inability to form the required [mental states] to commit the crime charged." *Ferrick*, 81 Wn.2d at 945.

■ ■ When determining the admissibility of expert testimony on diminished capacity, ER 702 requires that we engage in a two-part inquiry: (1) does the witness qualify as an expert; and (2) would the witness's testimony be helpful to the trier of fact. *State v. Farr-Lenzini*, 93 Wn. App. 453, 460, 970 P.2d 313 (1999). As to the latter inquiry, evidence is helpful if the " 'testimony concerns matters beyond the common knowledge of the average layperson, and does not mislead the jury to the prejudice of the opposing party.' " *Farr-Lenzini*, 93 Wn. App. at 461 (quoting *State v. Jones*, 59 Wn. App. 744, 750, 801 P.2d 263 (1990)). *See also Greene*, 139 Wn.2d at 73-79 (expert testimony on diminished capacity and insanity not helpful to trier of fact under ER 702 where evidence could not reliably connect symptoms to defendant's mental capacity).

Neither party disputes that Killoran was qualified to

---

[3] To the extent that Guilliot asserts that this ruling was error, he has failed to explain how it was prejudicial because Killoran testified at trial about diabetes and hypoglycemia.

testify as an expert. Thus, the issue is whether the trial court abused its discretion in determining that evidence about Guilliot's personality disorder and Killoran's opinion that Guilliot lacked the capacity to form the culpable mental states would not be helpful to the trier of fact.

■ As to the personality disorder, Killoran testified that Guilliot's narcissistic personality might have affected his ability to appropriately monitor his blood sugar levels, which in turn might have led to a hypoglycemic episode the morning of the shooting. Although Killoran testified that there was a "logical bridge between [Guilliot's] personality structure and his tendency to have insulin reactions," he acknowledged that the personality disorder did not cause Guilliot to commit the charged crime and that Guilliot's injection of his daily dose of insulin the morning of the shooting belied the theory that his personality structure suggested he might tend to ignore his diabetes. 7 RP at 328. Nor did Guilliot even tell Killoran whether he checked his blood sugar level the morning of the shooting.

Given these gaps in the causal link between Guilliot's personality disorder and his ability to form the required mental states the morning of the shooting, the trial court did not abuse its discretion in ruling that the mental disorder evidence did not satisfy the ER 702 test of being helpful to the jury. *See Atsbeha*, 142 Wn.2d at 921 (there must be a diagnosis of a particular mental disorder that, under the facts of the case, is "capable of forensic application in order to help the trier of fact assess the defendant's mental state at the time of the crime"). Thus, the trial court did not err in excluding the mental disorder evidence.

■ Guilliot also failed to establish a link between the general symptoms of hypoglycemia and his capacity to form the culpable mental states at the time of the shooting. Nor could Killoran connect the general symptoms of hypoglycemia, including confusion, irritability, violence, anger, and anxiety, with Guilliot's condition the morning of the shooting.

Killoran's opinion that Guilliot was hypoglycemic the

morning of the shooting was inconsistent with the testimony of Guilliot's treating physician who testified that when Guilliot's blood sugar level was as low as the 40s, Guilliot's sole complaint was headaches and that Guilliot never appeared to be incoherent at these levels. Although Guilliot reported that he experienced diaphoresis (perspiration), confusion, and a severe headache that morning, there is no evidence that he suffered from these symptoms to such a degree that they affected his ability to form the culpable mental states. Rather, his activities around the time of the shooting suggest that his capacity was not affected. Guilliot remembered showing Sullivan the gun, pointing it at her head, and shooting it twice. He then took the gun, drove to his parents' house, and made himself a beverage shake.

Again, without an adequate causal link between the hypoglycemia symptoms and Guilliot's mental capacity at the time of the shooting, Killoran's opinion that Guilliot lacked the capacity to form the culpable mental states was not helpful to the trier of fact. Thus, the trial court did not err in excluding it. *See Atsbeha,* 142 Wn.2d at 918-19 (diminished capacity expert testimony not relevant and not helpful to trier of fact because testimony did not relate to defendant's ability to form intent to deliver controlled substance; testimony suggested that defendant's capacity not impaired); *Greene,* 139 Wn.2d at 73-79 (expert testimony on dissociative identity disorder not helpful to trier of fact because it was not possible to reliably connect symptoms of disorder to defendant's mental capacity or sanity).

We note that Guilliot's defense based on hypoglycemia is similar to a voluntary or involuntary intoxication defense. *See People v. Morton,* 100 A.D.2d 637, 473 N.Y.S.2d 66, 68 (1984) ("Drugs have been recognized as a cause of voluntary intoxication and there is no logical reason why insulin should be treated differently, especially in light of the expert testimony that hypoglycemia, also known as insulin reaction, could produce an intoxicated state." (citations omitted)). *See also State v. Gilcrist,* 15 Wn. App. 892, 894,

552 P.2d 690 (1976) (in cases where physician prescribed a drug that caused intoxication, that intoxication has been held to be involuntary). A defendant seeking a voluntary intoxication instruction must show (1) that the charged crime has a mental element; (2) that there is substantial evidence of drinking; and (3) that there is evidence that the drinking affected the defendant's ability to form the requisite mental state. *State v. Gabryschak*, 83 Wn. App. 249, 252, 921 P.2d 549 (1996).

Thus, as with diminished capacity, "the evidence must reasonably and logically connect the defendant's intoxication with the asserted inability to form the required level of culpability to commit the crime charged." *Gabryschak*, 83 Wn. App. at 252-53. *See also State v. Coates*, 107 Wn.2d 882, 891, 735 P.2d 64 (1987) ("[I]t is not the fact of intoxication which is relevant, but the degree of intoxication and the effect it had on the defendant's ability to formulate the requisite mental state."). Applying these principles by analogy here, there was not substantial evidence of a link between an insulin reaction and Guilliot's ability to form the culpable mental states the morning of the shooting. Again, Guilliot's expert's opinion would not have helped the trier of fact and it was not an abuse of discretion for the trial court to exclude it.

## II. LESSER INCLUDED INSTRUCTIONS

Guilliot next argues that the trial court erred in refusing to give lesser included offense instructions for first and second degree manslaughter. The State asserts that because Guilliot argued that the shooting was accidental, he was not entitled to lesser included offense instructions on manslaughter.

In determining whether to give a lesser included offense instruction, we apply a two-prong test. *State v. Berlin*, 133 Wn.2d 541, 545, 947 P.2d 700 (1997); *State v. Workman*, 90 Wn.2d 443, 447-48, 584 P.2d 382 (1978). Under the legal prong, we determine if each of the elements

of the lesser offense is a necessary element of the greater charged offense. *Berlin*, 133 Wn.2d at 545-46; *Workman*, 90 Wn.2d at 447-48. Under the factual prong, we consider whether the evidence supports an inference that only the lesser offense was committed. *Berlin*, 133 Wn.2d at 546; *State v. Pettus*, 89 Wn. App. 688, 698, 951 P.2d 284 (1998). A mere possibility that the jury might disbelieve the State's evidence is not justification for a lesser included instruction. *Pettus*, 89 Wn. App. at 700.

 Here, there is no dispute as to the legal prong. *See State v. Warden*, 133 Wn.2d 559, 563, 947 P.2d 708 (1997). But the State contends that the evidence does not support the factual prong.

To commit manslaughter, one must either recklessly[4] cause the death of another (first degree) or with criminal negligence[5] cause the death of another (second degree). RCW 9A.32.060 and .070. But to commit first degree premeditated murder one must act with a premeditated intent to cause the death of another.[6] RCW 9A.32.030(1)(a).

The evidence in this case supports giving the requested lesser included offense instructions. The jury could have rationally concluded that Guilliot acted recklessly or with criminal negligence either in failing to appropriately monitor his blood sugar or in not acting with appropriate caution

---

[4] A person acts recklessly "when he knows of and disregards a substantial risk that a wrongful act may occur and his disregard of such substantial risk is a gross deviation from conduct that a reasonable man would exercise in the same situation." RCW 9A.08.010(1)(c).

[5] A person acts with criminal negligence "when he fails to be aware of a substantial risk that a wrongful act may occur and his failure to be aware of such substantial risk constitutes a gross deviation from the standard of care that a reasonable man would exercise in the same situation." RCW 9A.08.010(1)(d).

[6] Intent is acting "with the objective or purpose to accomplish a result which constitutes a crime." RCW 9A.08.010(1)(a). Premeditation is forming an intent, after deliberation that is more than a moment in time, to take another person's life. RCW 9A.32.020; 11 WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 26.01.01, at 283 (2d ed. 1994). Further, case law defines premeditation as " 'the deliberate formation of and reflection upon the intent to take a human life' and involves 'the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short.' " *State v. Pirtle*, 127 Wn.2d 628, 644, 904 P.2d 245 (1995) (quoting *State v. Gentry*, 125 Wn.2d 570, 597-98, 888 P.2d 1105 (1995)).

when he showed Sullivan the gun.

The only Washington case the State relies on is inapposite.[7] In *State v. Hernandez*, 99 Wn. App. 312, 318, 997 P.2d 923 (1999), *review denied*, 140 Wn.2d 1015 (2000), the State charged the defendant with second degree murder under the alternatives of intentional and felony murder. The jury convicted the defendant as charged after the trial court refused to instruct on first and second degree manslaughter but instructed the jury on excusable homicide based on the defendant's assertion that the shooting was accidental. *Hernandez*, 99 Wn. App. at 314, 318.

The Court of Appeals affirmed the trial court's refusal to instruct on the lesser included offenses, finding that the defendant's statements to police did not admit to any acts that caused his girl friend's death. *Hernandez*, 99 Wn. App. at 320. Further, the court found that the jury was properly instructed that if they believed the defendant's theory of accident, it was a completely excusable homicide. *Hernandez*, 99 Wn. App. at 320-21. Here, unlike in *Hernandez*, Guilliot admitted that he was showing Sullivan the gun, demonstrating how to use it, and pointing it at her when he shot her.

 Nonetheless, the trial court's error in denying the lesser included offense instructions was harmless because the court instructed the jury on first and second degree murder but the jury rejected the second degree offense and

---

[7] The State also cites to a New York case where the defendant defended against a second degree murder charge by arguing that he suffered from hypoglycemia at the time of the shooting, which in effect rendered him intoxicated. *Morton*, 473 N.Y.S.2d at 67. The trial court denied the defendant's request to instruct the jury on second degree manslaughter (reckless) and criminally negligent homicide. *Morton*, 473 N.Y.S.2d at 67. The appellate court reversed, concluding that the trial court should have instructed on second degree manslaughter because the evidence supported a conclusion that the defendant acted recklessly. *Morton*, 473 N.Y.S.2d at 68-69. But because a person who fails to perceive a risk by reason of intoxication acts only recklessly, the evidence did not support an inference that the defendant acted with criminal negligence. *Morton*, 473 N.Y.S.2d at 69.

But in New York, unlike in Washington, the statute defining the culpable mental states specifically provided that a person who is unaware of a risk solely because of voluntary intoxication acts recklessly. *Morton*, 473 N.Y.S.2d at 69. Thus, we cannot apply that court's holding to this case.

chose to convict Guilliot of first degree murder. *See State v. Hansen*, 46 Wn. App. 292, 297-98, 730 P.2d 706, 737 P.2d 670 (1986) (trial court's failure to instruct on lesser included offense of unlawful imprisonment harmless where court instructed on first and second degree kidnapping but jury convicted the defendant of first degree kidnapping); *State v. Barriault*, 20 Wn. App. 419, 427, 581 P.2d 1365 (1978) (defendant not prejudiced by court's failure to give second degree manslaughter instruction where court instructed on second degree murder and first degree manslaughter and the jury convicted the defendant of the greater offense). *See also Schad v. Arizona*, 501 U.S. 624, 646-48, 111 S. Ct. 2491, 115 L. Ed. 2d 555 (1991) (defendant not entitled to every lesser included noncapital offense instruction in capital case where jury not given all-or-nothing choice between first degree murder conviction or acquittal; use of second degree murder instruction sufficient to ensure verdict's reliability); *State v. Williams*, 977 S.W.2d 101, 106-08 (Tenn. 1998) (error in failing to instruct on voluntary manslaughter was harmless where jury convicted defendant of first degree premeditated murder and rejected option of convicting of second degree murder and reckless homicide).

If the jury believed that Guilliot was less culpable due to an accident or his hypoglycemia, logically it would have returned a verdict on the lesser offense of second degree murder. But the jury rejected this intermediate offense and elected to convict him on the highest offense. Thus, because the factual question posed by the omitted manslaughter instructions was necessarily resolved adversely to Guilliot by the jury's rejection of second degree murder, this error does not require reversal. *See Hansen*, 46 Wn. App. at 297.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

MORGAN and HOUGHTON, JJ., concur.

Review denied at 145 Wn.2d 1004 (2001).