# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| KIMBERLY A. HANSEN, as her separate estate, formerly known as KIMBERLY ROZGAY, | ) ) ) ) | No. 74636-7-I consolidated with No. 75131-0 No. 75132-8 |
| Appellant, | ) ) | |
| v. | ) ) | DIVISION ONE |
| MARK A. ROZGAY, individually and in his capacity as Personal Representative Estate of BARBARA ROZGAY, Trustee of the CORDES TRUST, ROZGAY FAMILY INVESTMENTS, LLC, a Washington Limited Liability Company and the marital community of MARK ROZGAY AND BABBIE ROZGAY, Husband and Wife, | ) ) ) ) ) ) ) ) ) | ORDER DENYING MOTION FOR RECONSIDERATION, WITHDRAWING AND SUBSTITUTING OPINION |
| Respondents. | ) ) ) | |

Appellant Kimberly Hansen filed a motion for reconsideration of the court's opinion filed on September 11, 2017. The court has considered the motion and determined that reconsideration should be denied, the opinion filed on September 11, 2017, should be withdrawn, and an unpublished substitute opinion should be filed in order to correct a scrivener's error.

Now, therefore, it is hereby

ORDERED that appellant's motion for reconsideration is denied. It is further

No. 72533-5-I/2

ORDERED that the opinion of this court filed shall be withdrawn and an unpublished substitute opinion shall be filed.

Mann, J.

Vwellin, C.J.

Dwyer, J.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

KIMBERLY A. HANSEN, as her
separate estate, formerly known as
KIMBERLY ROZGAY,

               Appellant,

               v.

MARK A. ROZGAY, individually and in
his capacity as Personal Representative
Estate of BARBARA ROZGAY,
Trustee of the CORDES TRUST,
ROZGAY FAMILY INVESTMENTS,
LLC, a Washington Limited Liability
Company and the marital community of
MARK ROZGAY AND BABBIE
ROZGAY, Husband and Wife,

               Respondents.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 74636-7-I
consolidated with
No. 75131-0
No. 75132-8

DIVISION ONE

UNPUBLISHED OPINION

FILED: October 23, 2017

MANN, J. — Appellant Kim Hansen (Hansen) and Respondent Mark Rozgay

(Rozgay) are two of four children adopted by Clarence and Barbara Rozgay. In

December 2010, Rozgay assisted his parents in finding an estate planning lawyer who

prepared a series of estate documents including a revocable trust and irrevocable trust.

One effect of the 2010 estate plan was to disinherit Hansen from her parents' estate.

After her mother's death, Hansen brought this action seeking to invalidate several of the estate documents asserting her parents' lack of capacity and Rozgay's undue influence. The trial court dismissed Hansen's action on summary judgment.

We affirm in part and reverse in part. We also vacate the trial court's award of attorney fees.

## FACTS

### A.    Cordes Trust

Barbara Rozgay's parents, Herman and Harriet Cordes, established the "Cordes Living Trust of 1979" (Cordes trust). The Cordes trust was established to meet Barbara's[1] expenses for life, then, upon her death, the assets were to be distributed to Barbara and Clarence's four children as residual beneficiaries. The Cordeses originally conveyed their Hood Canal waterfront home to the Cordes trust. In 1991, however, the Hood Canal home was conveyed to Barbara as her separate property. In 2004, Barbara's son Rozgay became the trustee of the Cordes trust. Rozgay and Hansen, along with their two siblings Michael and Lisa, remain the residual beneficiaries of the Cordes trust.

### B.    2010 Estate Planning

In 2010, Clarence and Barbara updated their estate planning. In October 2010, Rozgay took Barbara to meet with the Cordes trust accountants to discuss tax planning, the Hood Canal home, and a community property collection of art. The accountants recommended Rozgay obtain an appraisal for the Hood Canal house, which he

_____

[1] In order to avoid confusion, we refer to Barbara and Clarence Rozgay by their first names. No disrespect is intended.

subsequently did. Rozgay then contacted an estate planning attorney, Kanoa Ostrem, based on a referral from a business associate. On December 21, 2010, Rozgay accompanied Clarence and Barbara to meet with Ostrem and a financial planner.

Following the December meeting, Ostrem sent an e-mail to Rozgay with an outline and budget for an estate plan that included a transfer of the Hood Canal house. One of the items left unresolved in the outline was that "Mr. and Mrs. Rozgay must decide about Kim's share." Ostrem explained that he could complete "the Hood Canal portion this year and the remaining planning shortly after Mr. and Mrs. Rozgay make a decision about Kim's share." The next morning, Rozgay responded by e-mail telling Ostrem to "please move forward on all of this."

Ostrem ultimately prepared 24 estate planning documents for Barbara and Clarence. The documents included the last will and testaments for Barbara and Clarence, a community property agreement, general durable powers of attorney, and medical powers of attorney. The documents also established the Rozgay Family Living Trust (Living Trust), the Rozgay Irrevocable Trust (Irrevocable Trust), and the Rozgay Family Investments, LLC (LLC).

Ostrem e-mailed the documents to Rozgay on December 23, 2010. According to Ostrem's e-mail, "your parents need to make a decision about Kim's share. That is the only blank in the documents." Ostrem testified that he met alone with Clarence and Barbara on December 23 or 24, 2010, but did not have records of the meeting. Detailed daily journals by Barbara and Clarence's full-time caregivers do not reference any meetings between December 22 and December 26, 2010.

Rozgay, Clarence, and Barbara next met with Ostrem on December 27, 2010, at Clarence and Barbara's home. Clarence and Barbara executed the 24 documents creating a comprehensive estate plan. By way of summary, the estate planning documents resulted in the following actions:

First, Clarence and Barbara entered a community property agreement that irrevocably transferred Barbara's separate property Hood Canal house and her investment portfolios to the marital community.

Second, Clarence and Barbara created the LLC. They were each originally 50-50 members in the LLC. Rozgay was named as the LLC manager. Clarence and Barbara then deeded the Hood Canal house to the newly created LLC in exchange for membership units.

Third, Clarence and Barbara created the Irrevocable Trust. Clarence and Barbara were named as trustors and Rozgay was named as the Trustee. Under the terms of the Irrevocable Trust, during Clarence and Barbara's lifetime, the Trustee (Rozgay) was to distribute net income as necessary to support Rozgay, his brother Michael, and their families. Upon Clarence and Barbara's deaths, the Irrevocable Trust was to be divided between Rozgay, his brother Michael, and their families. The Irrevocable Trust made no provision for Hansen or her sister Lisa.

With the Irrevocable Trust established, Clarence and Barbara both signed three assignments conveying the majority of their individual membership units in the LLC to the Rozgay Irrevocable Trust. The rest of their individual units were conveyed to the Irrevocable Trust through a signed purchase and sale agreement. The end result was that the Rozgay Irrevocable Trust became the sole member of the LLC. Clarence and

Barbara received a promissory note in payment for their units from the Irrevocable trust.[2]

Fourth, Clarence and Barbara created the Living Trust and transferred their remaining community property into it. Clarence and Barbara then deeded their Medina home to the Living Trust. The Living Trust was established to pay Clarence and Barbara's expenses while there were alive, and then be distributed to Rozgay, his brother Michael, and their families, after Clarence and Barbara's death. The Living Trust expressly made no provision for Hansen or Lisa.

Fifth, Clarence and Barbara signed their wills. The wills made provisions to transfer tangible personal property to the surviving spouse, or if the spouse was deceased, to Rozgay, his brother Michael, and their families. The wills expressly made no provision for Hansen or Lisa. Any residual property was to be distributed to the Living Trust.

Finally, Rozgay was made the attorney-in-fact for both Clarence and Barbara, under a durable power of attorney and a medical power of attorney.

C.    Post Estate Plan

Beginning in 2009 or early 2010, Clarence and Barbara had full-time live-in caretakers. In February 2011, Clarence and Barbara were institutionalized in the Memory Loss Care Unit of Overlake Terrace. At the time he checked them in, Michael informed the Memory Loss Care Unit that Clarence and Barbara both were incontinent,

---

[2] Rozgay testified that there was an oral agreement that the promissory note was never intended to be paid, but would be satisfied "with gifts over the course of time."

had dementia, and had CPAP machines. Barbara had a feeding tube. Barbara died in September 2011. Rozgay became her personal representative.

After Barbara's death, Hansen received notice of Barbara's probate and learned she had been disinherited. Hansen sent Rozgay an e-mail questioning whether Rozgay had been involved in the decision to disinherit her. Rozgay responded that he had not told Barbara and Clarence who to include in their will, however, he had told them to include himself and Michael in the inheritance of the Hood Canal house, because "no one had heard from" Hansen. Hansen became suspicious of Rozgay's involvement in the estate plan and requested an accounting from Rozgay, as the trustee of the Cordes trust. Rozgay provided Hansen with a formal accounting of the Cordes trust.

Hansen then filed this action before the King County Superior Court. The complaint sought, in part, to (1) terminate the power of attorney appointing Rozgay as attorney-in-fact for Clarence,[3] (2) to invalidate the Irrevocable Trust, Livable Trust, and LLC, and restore the probate estate of Barbara for Clarence, and (3) an order quieting title to the Hood Canal house distributing 50 percent to Clarence and 50 percent for the benefit of all four of the Rozgay children as intestate heirs, and (5) damages.

On January 4, 2015, the trial court granted Rozgay's motion for summary judgment dismissing all of Hansen's claims. The trial court subsequently granted Rozgay's motion for attorney fees pursuant to the Trust Estate Dispute Resolution Act, Ch. 11.96A (TEDRA), RCW 11.94.120, and RCW 11.24.050. The trial court awarded

---

[3] Clarence Rozgay died while this matter was pending rendering moot Hansen's claim to remove Rozgay's power of attorney.

Rozgay $174,603.50 for attorney fees and $16,329.66 for costs against Hansen's marital community. Hansen appeals.

## ANALYSIS

### *Exclusion of Testimony*

Before reaching the merits of the substantive arguments, we must resolve an evidentiary issue. In response to Rozgay's motion for summary judgment, Hansen offered a declaration from her expert Jullie M. Gray, MSW, a licensed independent clinical social worker. Based on her knowledge, skill, experience, training, and education, combined with her review of medical records, deposition transcripts, and journal entries from Clarence and Barbara's full-time caregivers, Gray opined that by December 2010, Clarence and Barbara had very serious cognitive problems and "could not possibly have read or understood the contents of the documents presented for their signature on December 27, 2010." Gray further opined that Clarence and Barbara were "particularly vulnerable to undue influence over the conduct of their personal affairs, including financial affairs."

In response to Rozgay's motion, the trial court struck Gray's declaration, stating "the testimony of expert witness Jullie Gray is stricken and not considered because she is not qualified to render medical opinions and Plaintiff failed to timely disclose her opinion." Hansen argues that the trial court erred in striking the declaration testimony of her expert. We agree.

### A. Discovery Sanction

We review a trial court's decision to exclude evidence for an abuse of discretion. Jones v. City of Seattle, 179 Wn.2d 322, 337, 314 P.3d 380 (2013). A court abuses its

-7-

discretion in admitting or excluding expert testimony when its decision is manifestly unreasonable or based on untenable grounds or reasons. The exclusion of testimony for discovery violations is a severe sanction. Before imposing such a sanction, it must be apparent from the record that the trial court explicitly considered the three Burnet factors: (1) whether a lesser sanction would probably suffice, (2) whether the violation was willful or deliberate, and (3) whether the violation substantially prejudiced the opposing party. Burnet v. Spokane Ambulance, 131 Wn.2d 484, 494, 933 P.2d 1036 (1997); Jones, 179 Wn.2d at 338. The record before us is devoid of any analysis of the Burnet factors.

Hansen's August 2015 primary witness list disclosed that Gray would testify as an expert witness "regarding the capacity of Clarence and Barbara Rozgay." The disclosure included Gray's curriculum vitae (CV). During discovery, Rozgay asked Hansen to identify all evidence that would support her contention that Clarence and Barbara lacked capacity. Hansen's October 2015 response again identified the expert testimony of Gray. While Hansen's response did not include the specifics of Gray's opinions, Rozgay did not request additional information or seek an order compelling discovery.

Even though Hansen's initial disclosure was incomplete, there is no evidence that a lesser sanction, such as granting Rozgay an extension and leave to depose Gray, was considered. The trial court abused its discretion in excluding Gray's testimony due to Hansen's delay in disclosing Gray's opinion.

B.    ER 702

The trial court also found that Gray was not qualified "to render medical opinions." The trial court did not explain the basis for this decision. ER 702 controls the testimony of experts.[4] On summary judgment the court engages in a two-part inquiry: "(1) does the witness qualify as an expert; and (2) would the witness's testimony be helpful to the trier of fact." State v. Guilliot, 106 Wn. App. 355, 363, 22 P.3d 1266 (2001); Acord v. Pettit, 174 Wn. App. 95, 302 P.3d 1265 (2013). Once a witness is qualified as an expert, argument goes to the weight—not the admissibility of the testimony. Keegan v. Grant Cy. Pub. Util. Dist. No. 2, 34 Wn. App. 274, 283, 661 P.2d 146 (1983).

Ordinarily, "[q]ualifications of expert witnesses are to be determined by the trial court within its sound discretion, and rulings on such matters will not be disturbed unless there is a manifest abuse of discretion." Oliver v. Pacific Northwest Bell Tel. Co., 106 Wn.2d 675, 683, 724 P.2d 1003 (1986)). However, "[t]he de novo standard of review is used by an appellate court when reviewing all trial court rulings made in conjunction with a summary judgment motion." Folsom v. Burger King, 135 Wn.2d 658, 663, 958 P.2d 301 (1998); Seybold v. Neu, 105 Wn. App. 666, 678, 19 P.3d 1068 (2001).

Rozgay argues that Gray was not qualified to opine on Clarence and Barbara's capacity and vulnerability to undue influence because she is not a licensed physician. We disagree. A witness may be qualified as an expert by her knowledge, skill,

---

[4] "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact at issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." ER 702.

experience, training, or education. ER 702. "Practical experience is sufficient to qualify a witness as an expert." State v. Ortiz, 119 Wn.2d 294, 310, 831 P.2d 1060 (1992), overruled on other grounds, State v. Condon, 182 Wn.2d 307, 343 P.3d 357 (2015). Washington courts have held that certified social workers, psychologists, and mental health social workers can be competent to diagnose mental disorders and provide expert opinion about mental disorders. See, e.g., In re Det. of A.S., 138 Wn.2d 898, 918, 982 P.2d 1156 (1999) (social worker may testify to the existence of a mental disorder); Saldivar v. Momah, 145 Wn. App. 365, 397-98, 186 P.3d 1117 (2008) (social worker may testify regarding whether individual was suffering from PTSD).

Gray's extensive CV was included with her December 2015 declaration. It shows that she obtained a Masters of Social Work from the University of Washington in 1991. She is licensed or certified as: (1) a Licensed Independent Clinical Social Worker, (2) a Certified Care Manager, certified by the National Academy of Certified Care Manager, (3) was certified by the Washington Supreme Court as a Certified Professional Guardian from 2008 to 2013, and (4) holds a Geriatric Mental Health Certificate issued by the University of Washington. Gray serves on the King County Elder Abuse Council, and at the time of her declaration was the president of the National Academy of Certified Care Managers. She has instructed health care and social service professionals, as well as the general public, on issues related to aging, ethics, and dementia. From 1995 to 2004, Gray was a lead social worker for the Evergreen Emergency Department where her work included mental health evaluations and assessment of elder abuse. From 2004 to 2007, Gray was a case manager with Evergreen Hospice where her duties included conducting psychosocial assessments.

Gray is currently a principal at a private care-management company providing consulting to older adults, adults with disabilities, and families regarding problems related to aging and dementia.

We find that Gray was qualified to opine on issues related to Clarence and Barbara's capacity and vulnerability to undue influence. While Gray's opinions were based on her review of records and she did not conduct her own examination, this goes to the weight of the testimony, not its admissibility. Keegan, 34 Wn. App. at 283. Because Gray is qualified to give her opinions and her opinions may be helpful to the trier of fact, the trial court abused its discretion in striking and failing to consider Gray's declaration. Guilliot, 106 Wn. App. at 363.

*Statute of Limitations*

Hansen argues the trial court erred in concluding that her claims challenging the estate planning documents, including the formation of the LLC, the Irrevocable Trust and the Living Trust were "will contests" and thus time-barred by RCW 11.24.010. A trial court's interpretation of a probate statute is a question of law that we review de novo. In re Estate of Jones, 152 Wn.2d 1, 8-9, 93 P.3d 147 (2004).

An action is considered a will contest where the fundamental thrust of the claim is to determine issues "affecting the validity of the will." Cassell v. Portelance, 172 Wn. App. 156, 162, 294 P.3d 1 (2012); RCW 11.24.010. A will contest must be filed within four months following probate. RCW 11.24.010. Washington courts strictly enforce the requirements for commencing a will contest. In re Estate of Jepsen, 184 Wn.2d 376, 381, 358 P.3d 403 (2015) (citing In re Estate of Toth, 138 Wn.2d 650, 653, 981 P.2d 439 (1999)). "The four-month period is absolute. . . . If the will contest is not filed prior

to the expiration of the four-month period, the contest will be absolutely barred." Toth, 138 Wn.2d at 656.

There is no dispute that Hansen's lawsuit was filed long after the four-month limit for contesting Barbara's will. Barbara passed away in September 2011; Hansen filed this action in December 2014. It is also undisputed that Hansen's complaint did not challenge Barbara's will. Instead Hansen challenged the validity of the Living Trust, the Irrevocable Trust, the LLC, and the community property agreement. Rozgay argues that because the estate planning documents were executed at the same time as the will, Hansen's action to invalidate the estate planning documents must be deemed a will contest and subjected to the four-month statute of limitations. On these facts, we disagree.

Rozgay relies on Cassell, and In re Estate of Palmer v. World Gospel Mission, 146 Wn. App. 132, 137-38, 189 P.3d 230 (2008). Both cases are factually distinguishable. Cassell involved a wrongful death action against a doctor brought by the surviving wife, Rhoda Cassell, as personal representative for her husband David Finch. Three years after Finch's death, and four days before the wrongful death trial was scheduled to begin, the doctor moved to dismiss the suit on the basis that the will appointing Cassell as personal representative was a fraud. Cassell, 172 Wn. App. at 159. The trial court granted a continuance allowing the doctor to address the issue with the probate court. The doctor was subsequently granted leave to intervene before the probate court. Cassell, 172 Wn. App. at 156. After the probate court nullified the original appointment of Cassell as the personal representative, the trial court

determined that any actions taken by Cassell, including filing the wrongful death action, were null and void. Cassell, 172 Wn. App. at 161-62.

This court reversed the probate court's order granting the doctor leave to intervene before the probate court. While the doctor denied that his motion to intervene was an attempt to initiate a will contest, we disagreed:

> These allegations—that Finch lacked the capacity to make a will on the day he signed in, that he had not signed the will, and that the will was not properly witnessed—are precisely what a court considers in a will contest under RCW 11.24.010.

Cassell, 172 Wn. App. at 163. Thus, despite the doctor's characterization, we concluded that a "court may treat a motion as a will contest, even where the petitioner styles it otherwise." Cassell, 172 Wn. App. at 162 (citing Palmer, 146 Wn. App. at 137-38). And, because the doctor lacked standing to bring a will contest under RCW 11.24.010, we reversed.

In Palmer, husband and wife decedents established a revocable living trust agreement that designated the World Gospel Mission as the 75 percent beneficiary with the remainder to be designated to their children and grandchildren. On that same date, the decedents executed pourover wills that bequeathed their entire estates to the living trust. Palmer, 146 Wn. App. at 134. The husband died in 2001 and the wife died in 2003. Palmer, 146 Wn. App. at 135. Over three years later, one of the decedents' daughters, Dawn Palmer Golden, moved to disqualify the World Gospel Mission as a trust beneficiary. Palmer, 146 Wn. App. at 135. A superior court commissioner held that Golden's claims were, in essence, a will challenge and time-barred under RCW

11.24.010. The trial court declined to revise the commissioner's decision. Palmer, 146 Wn. App. at 135-36.

On appeal, Golden argued that her claims challenged the validity of the testamentary trust as opposed to a will contest. Palmer, 146 Wn. App. at 136. The Court of Appeals disagreed, noting that Golden's challenge to the distribution of the decedents' estate could not be separated from a challenge to the validity of the portion of the wills conveying the estate to the living trust. The court found that: "Under these facts Golden's challenge is, in all important respects, a will contest." Palmer, 146 Wn. App. at 137.

Here, unlike Cassell, where the doctor was challenging the signatures on the will—a blatant will contest—Hansen is not challenging any aspect of Barbara's will. She is challenging the validity of the estate documents transferring title and assigning beneficiary interests in Clarence and Barbara's property through the community property agreement, Irrevocable Trust, LLC, and Living Trust.

And unlike Palmer, where the irrevocable trust was dependent upon, and funded only by, the pourover will, the estate documents here were stand-alone and not dependent upon the will. The community property agreement had the immediate effect of irrevocably transferring title to Barbara's separate property interest in the Hood Canal house and her investment portfolio to the marital community. Clarence and Barbara then deeded the Hood Canal house to the LLC and transferred their interests in the LLC to the Irrevocable Trust. None of these irrevocable transfers were dependent upon the will. Similarly, while the wills did provide for any residual property to be distributed to the Living Trust, the Living Trust was not dependent on this provision in the wills. The

-14-

Living Trust was established in December 2010 and immediately funded by Clarence and Barbara's remaining community property, and then a month later by the Clarence and Barbara transferring title to the Medina home into the Living Trust.

The Living Trust, the Irrevocable Trust, and the LLC, were all created separate and apart from Barbara's will and a claim challenging their creation does not require the court to determine issues "affecting the validity of" Barbara's will. The trial court erred in finding that Hansen's claims challenging the community property agreement, trusts, and LLC were "will contests" barred by RCW 11.24.010.

*Undue Influence and Lack of Capacity*

Hansen argues next that the trial court erred in dismissing her claims that Clarence and Barbara lacked capacity to enter the challenged documents and were subject to undue influence. Because of the high burden of proof required to demonstrate lack of capacity we agree that, based on the evidence presented, dismissal was appropriate. However, we agree with Hansen that the trial court erred in dismissing her claim for undue influence on summary judgment. We address each claim in turn.

A    Standard of Review

We review decisions on summary judgment de novo and engage in the same inquiry as the trial court. Folsom, 135 Wn.2d at 663. Summary judgment is properly granted when the pleadings, affidavits, depositions, and admissions on file demonstrate there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). The burden is on the moving party to demonstrate that there are no genuine issues of material fact. Folsom, 135 Wn.2d at 663. We consider all the

facts and make all reasonable, factual inferences in the light most favorable to the nonmoving party. Young v. Key Pharms., Inc., 112 Wn.2d 216, 226, 770 P.2d 182 (1989). "The motion should be granted only if, from all of the evidence, a reasonable person could reach only one conclusion." Folsom, 135 Wn.2d at 663.

The general principles of summary judgment are supplemented by additional principles when a party claims undue influence and lack of capacity. The determination of undue influence and capacity both require proof at trial by clear, cogent, and convincing evidence, and we incorporate that standard of proof in conducting substantial evidence review. In re Trust and Estate of Melter, 167 Wn. App. 285, 300, 273 P.3d 991 (2012); Kitsap Bank v. Denley, 177 Wn. App. 559, 569-70, 312 P.3d 711 (2013). The party bearing the burden of proof at trial must present sufficient evidence to make it "highly probable" that the claim will prevail at trial. Kitsap Bank, 177 Wn. App. at 569. Thus, "[a] trial court may grant a summary judgment motion to dismiss if no rational trier of fact, viewing the evidence in the light most favorable to the nonmoving party, could find clear, cogent, and convincing evidence on each element." Kitsap Bank, 177 Wn. App. at 569-70 (citing Melter, 167 Wn. App. at 301).[5]

---

[5] Our review here necessarily includes consideration of the Declaration of Jullie Gray. As our Supreme Court has explained:

> An appellate court would not be properly accomplishing its charge if the appellate court did not examine *all* the evidence presented to the trial court, including evidence that had been redacted. The de novo standard of review is used by an appellate court when reviewing all trial court rulings made in conjunction with a summary judgment motion. This standard of review is consistent with the requirement that evidence and inferences are viewed in favor of the nonmoving party, and the standard of review is consistent with the requirement that the appellate court conduct the same inquiry as the trial court.

Folsom, 135 Wn.2d at 663 (citing Lamon v. McDonnell Douglas Corp., 91 Wn.2d 345, 349, 588 P.2d 1346 (1979) and Mountain Park Homeowners Ass'n v. Tydings, 125 Wn.2d 337, 341, 883 P.2d 1383 (1994)).

B.    Lack of Capacity

Hansen challenges Clarence and Barbara's capacity to enter three estate documents: the Living Trust, the Irrevocable Trust, and the LLC. Because the standard for determining capacity differs between testamentary and transactional documents, we review each separately.

1.    The Living Trust

Because the Living Trust is a revocable trust, it requires the same capacity as that for creating a will. RCW 11.103.020. See also UNIF. TRUST CODE § 402, 7C U.L.A. 481 (2006). "[A] person is possessed of testamentary capacity if at the time he assumes to execute a will he has sufficient mind and memory to understand the transaction in which he is then engaged, to comprehend generally the nature and extent of the property which constitutes his estate and of which he is contemplating disposition, and to recollect the objects of his bounty." In re Bottger's Estate, 14 Wn.2d 676, 685, 129 P.2d 518 (1942).

"Where a will is rational on its face and is shown to have been executed in legal form, the law presumes that the testator had testamentary capacity and that the will speaks his wishes." Dean v. Jordan, 194 Wn. 661, 668, 79 P.2d 331 (1938). "Evidence challenging testamentary capacity usually consists of medical testimony, testimony of attesting witnesses, and testimony of other lay witnesses." In re Estate of Eubank, 50 Wn. App. 611, 618, 749 P.2d 691 (1988). With respect to medical testimony, special consideration should be given to the opinion of the attending physician. Eubank, 50 Wn. App. at 618.

Rozgay offered the declaration of Clarence and Barbara's treating physician, Dr. Henry Williams. Dr. Williams treated both Clarence and Barbara for several years. Dr. Williams reviewed Clarence and Barbara's medical records for 2009, 2010, and 2011, and opined:

> The medical records in 2009 show that Clarence had a mini mental status exam with a score of 28 out of 30, which means that he was clearly capable of providing informed consent, and his judgment was good. Often when he got sick he suffered from temporary delirium, which is a temporary worsening of dementia symptoms, but in between these episodes of delirium, and at least until the later part of 2011, he would return to a reasonably good cognitive function, when he could provide informed consent. Barbara Rozgay had no cognitive functioning issues.
>
> I understand that Clarence and Barbara Rozgay executed estate planning documents in December 2010. Based on my recollection and review of his medical records, I believe that Clarence was clearly capable of understanding the significance of signing such documents and fully knew who his family members were and the scope of his assets and their value.

Rozgay also offered the testimony of Clarence and Barbara's attorney Ostrem. Ostrem testified that after the initial meeting with Clarence, Barbara, and Rozgay, he talked with Clarence and Barbara by telephone to discuss potential changes to the estate plan, including whether to remove Hansen as a beneficiary. Ostrem then met with Clarence and Barbara to discuss the changes. During the December 23 or 24, 2010, meeting Clarence and Barbara instructed Ostrem to remove provisions for Hansen. Ostrem further testified that when he met with Clarence and Barbara to sign the documents on December 27, 2010, they were aware of the changes to the estate plan and agreed to them, and that Clarence was competent, participated in the conversation, and understood what they were discussing.

In contrast, Hansen provided deposition testimony from in-home caregiver Lisa Baker, who described several instances of Clarence acting in a state of delirium, his conversations not making sense, wandering out at night, and forgetting how to get around. Another caregiver, Debbie Loveless, testified that Clarence seemed unaware and confused. Hansen's expert, Jullie Gray, did not meet with either Clarence or Barbara, but instead reviewed and summarized the testimony of Baker and Loveless. Gray opined, that based on her knowledge, training, and experience, Clarence and Barbara lacked cognitive capacity to understand the estate planning documents.

While Hansen's evidence certainly raises a question on Clarence's capacity, Hansen failed to meet the high burden of demonstrating that it would be "highly probable" that she would prevail at trial. Kitsap Bank, 177 Wn. App. at 569. While it is undisputed that Clarence did have periods of time when he was confused or even delirious, the evidence is insufficient to prove a lack of testamentary capacity at the time of signing the will. Neither of the caregivers testified that the parents were in a condition of "general insanity" where they were unable to comprehend even "generally" the nature and extent of the property. "Failure of memory is not alone enough to create testamentary incapacity, unless it extends so far as to be inconsistent with the 'sound and disposing mind and memory requisite for all wills.'" In re Estate of Kessler, 95 Wn. App. 358, 371, 977 P.2d 591 (1999) (quoting In re Denison's Estate, 23 Wn.2d 699, 714, 162 P.2d 245 (1945)).[6]

---

[6] "It must always be remembered that there is a decided difference between eccentricity, mental peculiarities, misapprehensions, temporary or partial hallucinations on the one hand, and testamentary capacity on the other. Many persons have been at times violently insane, while at other times they were mentally sufficiently normal to enjoy testamentary capacity." In re Denison's Estate, 23 Wn.2d 699, 707, 162 P.2d 245, 249 (1945).

In light of the testimony of Clarence and Barbara's treating physician, even viewing the evidence in the light most favorably to Hansen, we cannot find that a rational trier of fact could find clear, cogent, and convincing evidence on each element necessary to provide a lack of testamentary capacity. Kitsap Bank, 177 Wn. App. at 569-70 (citing Melter, 167 Wn. App. at 301).

b.     The Irrevocable Trust and LLC

Unlike a will or revocable trust, both the Irrevocable Trust and LLC require general contract transactional capacity. As the comment to section 402 of the Uniform Trust Code explains,

> [T]his section includes a capacity standard for creation of a revocable trust because of the uncertainty in the case law and the importance of the issue in modern estate planning. No such uncertainty exists with respect to the capacity standard for other types of trusts. To create a testamentary trust, the settlor must have the capacity to make a will. To create an irrevocable trust, the settlor must have the capacity that would be needed to transfer the property free of trust.

UNIF. TRUST CODE § 601 cmt., 7C U.L.A. 545 (2006).[7]

The test for determining transactional capacity is similar to determining testamentary capacity. The test of mental capacity to contract is whether "the contractor possessed sufficient mind or reason to enable him to comprehend the nature, terms, and effect of the contract in issue." Page v. Prudential Life Ins. Co. of Am., 12 Wn.2d 101, 108-09, 120 P.2d 527 (1942). Although,

---

[7] See generally RESTATEMENT (THIRD) OF PROPERTY: WILLS AND OTHER DONATIVE TRANSFERS § 8.1 (2003); RESTATEMENT (THIRD) OF TRUSTS § 11 (2003); RESTATEMENT (SECOND) OF TRUSTS §§ 18-22 (1959). See also Karen E. Boxx & Katie S. Groblewski, Washington Trust Laws' Extreme Makeover: Blending with the Uniform Trust Code and Taking Reform Further with Innovations in Notice, Situs, and Representation, 88 WASH. L. REV. 813, 886 (2013).

> It is not necessary to show that a person was incompetent to transact any kind of business, but to invalidate his contract it is sufficient to show that he was mentally incompetent to deal with the particular contract in issue. On the other hand, to avoid a contract it is insufficient to show merely that the party was of unsound mind or insane when it was made, but it must also be shown that this unsoundness or insanity was of such a character that he had no reasonable perception or understanding of the nature and terms of the contract. The extent or degree of intellect generally is not in issue, but merely the mental capacity to know the nature and terms of the contract.

Page, 12 Wn.2d at 108-09.

As with testamentary capacity, transactional capacity is a question of fact to be determined at the time the transaction occurred. Page, 12 Wn.2d at 109.

Although the legal standard is higher for transactional capacity, Hansen again failed to establish that it would be highly probable that she would prove each element by demonstrating clear, cogent, and convincing evidence. Hansen has not presented evidence that at the time Clarence and Barbara signed the Irrevocable Trust and LLC, that they were mentally incompetent to deal with the particular contract at issue. The only marginally relevant evidence was the evidence that the parents did not remember the documents at a later time, and their accountant, Michael McAuliffe, mentioned that Clarence was losing cognitive abilities. McAuliffe did not, however, go so far as to claim that Clarence was unable to understand what was happening. This is still not "clear, cogent, and convincing" evidence that they did not understand the contracts at the time. Hansen failed to show the parents lacked contractual capacity. The trial court did not err in dismissing both Hansen's claims of lack of capacity.

-21-

3.    Undue Influence

"'Undue influence involves unfair persuasion that seriously impairs the free and competent exercise of judgment.'" Kitsap Bank, 177 Wn. App. at 570 (quoting In re Estate of Jones, 170 Wn. App. 594, 606, 287 P.3d 610 (2012)). In reviewing wills and gifts, the most important are: (1) a confidential or fiduciary relationship between the testator and beneficiary, (2) a beneficiary's active participation in the transaction, and (3) whether the beneficiary received an unusually large part of the estate. Kitsap Bank, 177 Wn. App. at 570-71; Melter, 167 Wn. App. at 298. The court should also consider factors "such as age and mental or physical health of the testator, the nature of the relationship, the opportunity for exerting undue influence, and the naturalness of the will." Kitsap Bank, 177 Wn. App. at 571; Melter, 167 Wn. App. at 298.

As a general rule, the party seeking to set aside an inter vivos gift, such as the Irrevocable Trust, has the burden of demonstration that the gift was invalid. Endicott v. Saul, 142 Wn. App. 899, 922, 176 P.3d 560 (2008). "But if the recipient has a confidential or fiduciary relationship with the donor, the burden shifts to the donee to prove 'a gift was intended and not the product of undue influence." Endicott, 142 Wn. App. at 922 (quoting Lewis v. Estate of Lewis, 45 Wn. App. 387, 389, 725 P.2d 644 (1986)); White v. White, 33 Wn. App. 364, 368, 655 P.2d 1173 (1982). "'[E]vidence to sustain the gift between such persons 'must show that the gift was made freely, voluntarily, and with a full understanding of the facts . . . If the judicial mind is left in doubt or uncertainly as to exactly what the status of the transaction was, the donee must be deemed to have failed in the discharge of his burden and the claim of gift must be rejected.'" Endicott, 142 Wn. App. at 922 (quoting McCutcheon v. Brownfield, 2 Wn.

-22-

App. 348, 356, 467 P.2d 868 (1970)). "The donee's burden of proof is by clear, cogent, and convincing evidence." Endicott, 142 Wn. App. at 922.

It is undisputed, and Rozgay readily admitted during oral argument, that there was a confidential or fiduciary relationship between Rozgay and Clarence and Barbara at the time they signed the estate planning documents. Thus, Rozgay has the burden of demonstrating, with clear, cogent and convincing evidence, that he did not assert undue influence over Clarence and Barbara.

Here, it is undisputed that Rozgay provided the accountant and attorneys that assisted his parents and was present at least at the initial meeting with the lawyer and accountant, with some evidence that he was present at later meetings. It is undisputed that attorney Ostrem sent the draft estate documents to Clarence and Barbara through Rozgay. There is also evidence that Rozgay provided advice to his mother about the Hood Canal house, including advice that they could leave Hansen out of ownership because no one had heard from her in a while.

It is also undisputed that Rozgay was present at the signing to answer any questions. Finally, Rozgay's share in the Irrevocable Trust and Revocable Trust was enhanced by Clarence and Barbara leaving Hansen out. With the removal of Hansen, Rozgay was able to receive a larger portion of the estate, and he became the trustee and sole manager of all of the new instruments. Finally, it is undisputed that Clarence and Barbara were elderly, and had demonstrated a loss of memory and cognitive ability. They clearly relied on Rozgay's expertise and connections.

While Rozgay presented contrary evidence, it was insufficient to demonstrate that it was "highly probable" that he would prevail at trial. We cannot find that no

-23-

rational trier of fact, viewing the evidence in the light most favorable to Hansen, could find clear, cogent, and convincing evidence to meet Rozgay's burden of demonstrating that there was no undue influence. Kitsap Bank, 177 Wn. App. at 569-70 (citing Melter, 167 Wn. App. at 301). The trial court erred in granting summary judgment on Hansen's claims for undue influence.

### Breach of Fiduciary Duty

Hansen argues next that after the Hood Canal house was placed in the Rozgay Irrevocable Trust, Rozgay, as trustee of the Cordes trust, used Cordes trust money to improve the Hood Canal house. Hansen maintains that this diversion was a gift taken from the Cordes trust that benefited Rozgay and Michael, the beneficiaries of the Hood Canal house, to the detriment of the other beneficiaries of the Cordes trust. This, Hansen contends, was a breach of Rozgay's fiduciary duty to the Cordes trust.

Hansen argues that the trial court erred in granting summary judgment and dismissing her claim that Rozgay breached his duties as trustee of the Cordes trust. We agree.[8]

The evidence offered by Hansen demonstrates that funds were drawn directly from the Cordes trust in order to pay for Hood Canal house expenses. Rick Miller, the accountant for the Cordes trust, expressed concern that those expenses weren't "really shared equally by Lisa and Kim." In response, Rozgay told Miller that the repairs to the Hood Canal house were something Barbara wanted done before transferring the house.

---

[8] As an initial matter, the trial court's finding that Hansen lacked standing to bring a claim that Rozgay breached his fiduciary duties as trustee for the Cordes trust was in error. For the Cordes trust, Rozgay is a "beneficiary trustee." In Washington, a beneficiary may serve as trustee, with some limitations that are not at issue here. See RCW 11.98.200. As a remainder beneficiary of the Cordes trust, Hansen has standing to bring a claim that Rozgay breached his duty as trustee. See RCW 11.100.045.

-24-

In response, Miller agreed to recategorize the expenses and treat the withdrawals "as distributions to your Mom prior to her death, and get these out of deductible expenses."

In support of his motion for summary judgment, Rozgay explained the use of the Cordes trust funds for the Hood Canal house:

> While she was alive, Barbara Rozgay exclusively directed the expenditures of money on the Hood Canal house, as she was then a member of the LLC that owns the house. She paid for the roof repair, gutters, water line replacement, and various other maintenance items. (Rozgay Decl. in Opp'n to Mot. for Accounting at' 8, Dkt. 45.) Barbara Rozgay used the income that she received from the Cordes Family Trust and the Rozgay Family Trusts to pay for many of the expenses, and she had complete discretion to use this income in any manner she chose. *(Id.)* Mr. Rozgay signed some of Barbara's checks, but this was commonplace because she had a difficult time writing due to arthritis, and he was an authorized signer on her account for that reason. *(Id.)* All use of income was known by the Cordes Trust CPA, Rick Miller, and fully documented in the accountings provided to Ms. Hansen in April of 2014.

In response, Hansen argues that Rozgay could not testify to his conversations with Barbara supporting his transfers of Cordes Trust funds under the "deadman's statute," RCW 5.60.030. In general, "if the person wanting to testify has an interest adverse to the decedent's estate and the opposing party claims through the estate, RCW 5.60.030 applies if the testimony offered involves a transaction with the deceased or communication by the deceased to the witness or in the presence of the witness." Thor v. McDearmid, 63 Wn. App. 193, 199, 817 P.2d 1380 (1991). The test is "whether the deceased, if living, could contradict the witness of his own knowledge." Thor, 63 Wn. App. at 199 (citing King v. Clodfelter, 10 Wn. App. 514, 516, 518 P.2d 206 (1974)).

Rozgay's testimony concerns uncorroborated conversations with Barbara, where she purportedly asked him to withdraw funds from the estate to benefit a property to which he had a future interest in. These withdrawals, if improper, would be adverse to

-25-

the estate, and are certainly adverse to the other beneficiaries of the Cordes trust. Although the statute does exclude "parties of record who sue or defend in a representative or fiduciary capacity, and have no other or further interest in the action," as the claim specifically asserts Rozgay improperly withdrew funds for his own benefit, he clearly maintains an interest in the action. RCW 5.60.030. Thus, this testimony is inadmissible under RCW 5.60.030.

Even considering Rozgay's testimony regarding Barbara's statements, there remains a question of fact as to whether Rozgay breached his fiduciary duty as trustee. Rozgay's testimony is the only evidence that Barbara wanted money transferred from the Cordes trust to pay for repairs on the Hood Canal house. A reasonable fact-finder could determine that Rozgay's testimony was not credible, and that he intentionally withdrew funds from the Cordes trust to the detriment of other trustee beneficiaries. Rozgay admitted to writing and signing Barbara's checks. And the evidence shows that these withdrawals weren't classified as expenditures on Barbara's behalf until after she had died. Both raise suspicion as to Rozgay's credibility. The trial court erred in granting summary judgment and dismissing Hansen's claim that Rozgay breached his fiduciary duty to the Cordes trust.[9]

### Order on Summary Judgment

Hansen next challenges the form of the trial court's order granting summary judgment. CR 56(h) provides, "[t]he order granting or denying the motion for summary

---

[9] Hansen also claims Rozgay breached his fiduciary duties in his administration of the Irrevocable Trust, including using his personal funds to update the Hood Canal house. Hansen admits that she is not a beneficiary to the Irrevocable Trusts and was not entitled to an accounting for these trusts. The trial court did not err in dismissing Hansen's claim.

judgment shall designate the documents and other evidence called to the attention of the trial court before the order on summary judgment was entered." Here, the order granting summary stated only that "the Court has reviewed and considered the files and pleadings in this case, including without limitation, the following: (1) Defendants' Motion for Summary judgment and all supporting declarations; (2) Plaintiff Hansen's Response to Defendant's Motion for Summary Judgment and all supporting declarations; and (3) Defendants' Reply In Support of Defendants' Motion for Summary Judgment and all supporting declarations." The order was deficient in failing to itemize the evidence considered.

While the order failed to itemize the individual declarations and evidence considered, the evidence considered was included in the clerk's papers before us on appeal and appears undisputed. Any error in failing to itemize evidence considered was harmless. See W.R. Grace & Co. v. Dep't of Revenue, 137 Wn.2d 580, 591, 973 P.2d 1011 (1999).

### Attorney Fees

Hansen finally challenges the trial court's award of attorney fees and costs. Because we reverse the trial court on at least some of Hansen's claims, and because the trial court did not segregate the fees awarded by claim, we vacate the award of attorney fees. The parties may seek appropriate fees and costs after trial.

## CONCLUSION

We affirm the trial court's decision dismissing: (1) Hansen's challenge to the estate planning documents for lack of capacity, (2) Hansen's claim for removal of Rozgay as attorney-in-fact for Clarence Rozgay, and (3) Hansen's claim that Rozgay breached his fiduciary duty to the Rozgay Family trusts or LLC.

We reverse the trial court's decision: (1) dismissing Hansen's challenge to the estate planning documents for undue influence, (2) dismissing Hansen's challenge because it was time barred, (3) dismissing Hansen's claim that Rozgay breached his fiduciary duty to the Cordes trust, and (4) striking the declaration of Hansen's expert.

We vacate the trial court's award of attorney fees.

_____

WE CONCUR:

_____          _____